**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NINA ANSARY,<br>[address to be provided under seal<br>pursuant to LCvR 5.1] | Case No.:_____ |
| *Plaintiff*, | |
| v. | **COMPLAINT** |
| THE CENTRAL BANK OF CURAÇAO<br>AND SINT MAARTEN,<br>Simon Bolivar Plein 1<br>Willemstad, Curaçao | |
| *Defendant.* | |

Plaintiff Nina Ansary, PhD ("Plaintiff" or "Dr. Ansary"), by and through her undersigned counsel, brings this Complaint against defendant, the Central Bank of Curaçao and Sint Maarten ("Central Bank" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

### Executive Summary

1.     Dr. Ansary, an award-winning author, historian, and women's rights activist, brings this action to redress Defendant's opportunistic raiding of her private investments, namely, her equity stake in Parman International B.V. ("PIBV"), a Curaçao company owned by a group of United States shareholders (the "US Shareholders"). Dr. Ansary owns 15.9% of PIBV, which is a $700 million enterprise that included insurance companies, banks, and 160 acres of mixed use commercial and residential property (including beachfront real estate). Central Bank, took "emergency" control of PIBV's insurance businesses in 2018 under the guise of "implementing" a "very extensive and well thought-out" "restructuring" developed after careful study over a period

of six months.[1]  But then, even after tapping $280 million of the enterprise's liquid investments in New York—which was sufficient to complete the restructuring—Central Bank did not follow through with the promised plan.  Rather, following the "major shock" to the economies of Curaçao and Sint Maarten caused by the global pandemic—Central Bank conspired with the governments of Curaçao and Sint Maarten to expropriate the assets of PIBV for the private interests of their cronies, rather than restore them to PIBV after promptly completing the restructuring.

2.     Indeed, after the onset of the novel coronavirus, which crippled the "already … struggling" Curaçao economy,[2] Central Bank relied on an age-old strategy:  Never let a good crisis go to waste.  Instead of merely implementing the "well thought-out" restructuring as initially announced, Central Bank pivoted to a different strategy:  *Hold on* to PIBV's valuable long-term investment assets[3] and *sell off* or expropriate them at depressed prices for the benefit of favored local constituents.  The only problem with this new plan was that, following the infusion of $280 million of liquid assets, the PIBV businesses were perfectly stable and revealing their true financial

---

[1]  *See* Translation of Transcript of Press Conference of Jose Jardim, Central Bank of Curaçao and Sint Maarten, dated July 5, 2018 ("Press Conference Transcript") attached hereto as Exhibit A.

[2]  *Kingdom of the Netherlands-Curaçao and Sint Maarten: Technical Assistance Report-Implementation of Risk-Based Supervision*, INTERNATIONAL MONETARY FUND (March, 25, 2022), https://www.imf.org/en/Publications/CR/Issues/2022/03/24/Kingdom-of-the-Netherlands-Curaao-and-Sint-Maarten-Technical-Assistance-Report-515719 ("The COVID-19 pandemic inflicted a major shock on the Curacao economy that had already been struggling with a protracted recession.  Stopover tourism arrivals in 2020 were 68 percent lower than in 2019, and a spike of COVID-19 cases in December 2020 resulted in the reintroduction of social distancing measures.  Subsequent spikes in COVID-19 cases in March/April 2021 resulted in a near-lockdown of the economy. . . .  The economic response supported by substantial financing from the Netherlands helped to cushion the shock.")

[3]  PIBV's assets include the "Ennia Group" a consortium of businesses that includes Ennia Caribe Holding N.V. ("Ennia Holding"), together with its wholly owned investment vehicle, EC Investments B.V. ("EC Investments"), and three sister Insurance Assets, Ennia Caribe Leven N.V. (life), Ennia Caribe Schade N.V. (property), and Ennia Caribe Zorg N.V. (health) (collectively, the "Insurance Assets"), among other entities.

condition would ruin everything.  So, Central Bank violated applicable laws and regulations and kept the assets' financial health secret until recently—and only *after* selling off the profitable banking operations to a local crony of a Central Bank director at a steep discount.  Unabashedly, Central Bank then announced its intention to continue using the fake four-and-a-half-years-old "emergency" to expropriate PIBV's interest in 160 acres of prime real estate in Sint Maarten—by fraudulently claiming it is time to "return" it "to the people."  Excited by this prospective heist, Sint Maarten has even begun holding a parliamentary inquiry to determine how to pull it off.

3.     Dr. Ansary seeks to put an end to this deprivation of her ownership interests in PIBV. This action is brought pursuant to (1) the international takings exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3); and (2) the commercial activities exception to the FSIA, 28 USC § 1605(a)(2).

**Central Bank Seizes PIBV's Ennia Group to "Restructure" Insurance Companies**

4.     In July 2018, Central Bank seized control of six PIBV companies (the "Seized Companies")—including three regulated insurance companies that collectively are Curaçao's largest provider of insurance products (including pension annuity products).  The remaining companies included the unregulated investment arm of the Ennia Group, known as EC Investments, and the unregulated holding company that sits on top of these entities, EC Holding.

5.     As is the case with any insurance enterprise, the Insurance Assets have always generated cash from policyholder premiums and need to invest that cash in order to satisfy future long-term liabilities.  Over the years from 2006 to 2016, the Insurance Assets deployed some of this cash by making loans to EC Investments in exchange for fixed interest payments over time. In the aggregate, the investments generated a substantial positive return for the Insurance Assets. At the time of Central Bank's seizure, EC Investments held approximately $280 million in cash

and marketable securities at Merrill Lynch in New York—more than enough liquid assets to repay the principal of all loans of policyholder premiums.

6.  Central Bank had for years approved of EC Investments borrowing and investing cash of the Insurance Assets until a drastic change in the local insurance regulations concerning affiliate transactions in 2015.  The new regulations disregarded any receivables owed by related parties (regardless of their value) for regulatory capital purposes.  Given the sudden change in the law, Central Bank granted the Insurance Assets until 2019 to replace their investments and come into regulatory compliance.  Prior to the expiration of this grace period, however, Central Bank did an about-face, reneged on its written assurance, and took control of all property belonging to PIBV's Ennia Group, including PIBV's rights to direct how its only assets are managed.

7.  Wholly distinct from the Insurance Assets, two long-term investment assets that are part of the PIBV group—Banco di Caribe N.V. ("Banco di Caribe") and SunResorts Ltd. N.V. ("SunResorts")—had been contributed to the capital of the Ennia Group over a decade ago.  These separate investments had been housed in EC Investments since their contribution.

**Central Bank Says Emergency Will Be Resolved in a Quick "Restructuring"**

8.  On July 3, 2018, Central Bank commenced emergency regulatory proceedings against PIBV's Ennia Group citing that the Insurance Assets had fallen out of compliance with new regulatory capital requirements.  Accordingly, at Central Bank's request, a Curaçao court imposed an "Emergency Regulation" over anything that Central Bank believed affected the insurance enterprise, including the ability to collect amounts invested with EC Investments.  Given the temporary nature of the perceived "emergency," Central Bank operated (and continues to operate) the Insurance Assets as usual and has continued writing new insurance policies without

interruption.  To date, no creditors (including policyholders) of the Insurance Assets have ever been in danger of nonpayment, and all have been paid in the ordinary course.

9.    Jose Jardim ("Jardim")—then-acting President of Central Bank—explained why the extraordinary measure was taken and why it would be short-lived.  In his own words, "we have been able to verify . . . that the Ennia group has assets, but they are not assets that comply with the requirements of the Central Bank."[4]  Still, Jardim provided reassurance that no beneficiary who purchased insurance or pensions from PIBV's Ennia Group was actually at risk of loss, because the issue was a regulatory capital matter that arose from the new 2015 regulations:  "[I]t is also important that we stress that what is being discussed is not at all the payment of pensions, nor the fact that when one has a policy and suffers damage or has medical expenses that these are covered. None of this is a point of discussion at this time, Ennia is in a position to continue fulfilling its obligations."[5]

10.    Jardim assured the public (including the US Shareholders) that the emergency measures would only be necessary for a specific purpose, which would be short-lived in duration:  "[W]e do not focus on an emergency measure process that will take years, yet we are talking about a much shorter process since we believe that the conditions exist to create an Ennia that is solvent again."[6] Significantly, Central Bank accurately described the reorganization plan that it had developed after six months of study:  "This will be done by bringing back into the company, especially into Ennia Caribe Leven [one of the Insurance Assets], the assets that are located elsewhere, in such a way that the company becomes solvent again."[7]  Central Bank was very specific that this internal

---

[4]   *See* Press Conference Transcript, Exhibit A.

[5]   *Id.*

[6]   *Id*.

[7]   *Id*.

restructuring of PIBV's Ennia Group entailed merely a re-ordering of asset ownership within the group: "This restructuring implies that all the assets and properties that are in fact owned by Ennia but that are located elsewhere, will re-enter Ennia's balance sheet, and that way the problem will be solved."[8]

11.    As is now known, although Central Bank did (or could have done) the simple reorganizational "restructuring" shortly after the seizure, it refused to let go of its new-found treasure.  Indeed, after the onset of the global pandemic, when Curaçao and Sint Maarten suffered huge economic losses, Central Bank changed its tune and began talking about monetizing, retaining, and preposterously even "giving back" assets that Defendant (and its constituent countries) never in fact paid for.

### Central Bank Captures Banco di Caribe and Mullet Bay

12.    As mentioned above, at the time of the Emergency Regulation, the assets owned by PIBV were worth more than $700 million.  Aside from the Insurance Assets (and the cash and securities at Merrill Lynch in New York), PIBV's long-term investment assets also included equity shares in SunResorts, with title to the Mullet Bay Resort ("Mullet Bay"), an extremely valuable and unique beachfront property in Sint Maarten.  PIBV's assets also included Banco di Caribe—a profitable bank operating in the Dutch Caribbean.  PIBV also owned a number of other businesses and assets.

13.    By cloaking the Emergency Regulation in secrecy, Central Bank could choose what to reveal about the Seized Companies' financial condition without scrutiny.  From behind the curtain, it developed a plan to use EC Investment's fortuitous position over Banco di Caribe and SunResorts to deprive Dr. Ansary of her pre-existing stake in these investments.  Recent events

---

[8]    *Id*.

have now made clear that Central Bank's continued grip over PIBV's Seized Companies—for over four-and-a-half years—has been pretextual and motivated by greed and cronyism.

14.     Neither Banco di Caribe nor SunResorts were ever involved in PIBV's insurance activities.  Accordingly, they were not even subject to Central Bank's regulatory seizure in July 2018.  The stake in Banco di Caribe and SunResorts had been acquired years before, and wholly independent of, any interest in the Insurance Assets.  Central Bank used the fact that the shares of these valuable companies were held through EC Investments (which Central Bank seized) to sell Banco di Caribe (against Plaintiff's will and at below fair market value), convert the proceeds for undisclosed and improper purposes, and are now in the process of expropriating her valuable real estate—a "Pearl of the Caribbean"—owned through SunResorts at the behest of Sint Maarten politicians.[9]

### Sale of Banco di Caribe to Jardim's Crony at Below-Market-Value

15.     Last year, in the midst of the global pandemic, Central Bank orchestrated the unnecessary fire-sale of Banco di Caribe to a local well-connected businessman with suspect reputation who was the preferred purchaser of Central Bank director, Jardim.  The fact that there was no legitimate reason to liquidate that profitable long-term investment asset (especially during the most inopportune time for a sale), and that only one bid was being entertained (from an unsuitable buyer previously known to Jardim) caused significant controversy within leadership of Central Bank—a showdown that upon information and belief was ultimately solved when non-party De Nederlandsche Bank NV ("DNB") stepped in to side with Jardim over his superiors to push the sale to proceed.

---

[9]     *Just Call,* STMAARTENNEWS.COM, (Aug. 2, 2022), https://stmaartennews.com/columns/just-call/ ("Mullet Bay, as the new "Pearl of the Caribbean' can provide a tremendous economic boost as an economic and job center of St. Maarten . . . .").

16.     Yet, even after such controversy, and even though PIBV's Seized Companies are indisputably flush with cash, Central Bank is now coordinating with the Parliament of Sint Maarten, which has designs to expropriate the valuable Mullet Bay property.  Sint Maarten has gone so far as even to create a parliamentary commission for the purpose of "Giving Mullet Bay Back to the People"—something that, while misleading, is no doubt easier to achieve while Sint Maarten's own Central Bank clings to control of this crown jewel asset.

**Central Bank Admits "Emergency" Ended No Later Than Q1 2021**

17.     Whatever Central Bank's initial reason for imposing the Emergency Regulation over PIBV's Seized Companies, it has been forced to reveal that it no longer exists.  Central Bank's recently revealed audited financial statements admit that two of three of PIBV's Insurance Assets were in fact restored to regulatory compliance almost two years ago *in the first quarter of 2021*. Unbeknownst to Plaintiff at the time, Central Bank also disclosed to its auditors in September 2021 that, based on "consultations with the Country of Curacao and the Netherlands," the "equity position" of the remaining Insurance Assets will "improve to the extent that, in time, the supervisory authorities' solvency requirements … can also be met."  Central Bank alternatively disclosed that the "National Ordinance on the Supervision of the Insurance Industry may be amended in order to restore the company's solvency."  Nevertheless, Central Bank simultaneously took the position that "the option of transferring the company to an interested party cannot be ruled out."  In large part, Central Bank's efforts to obfuscate the financial picture relied (unsuccessfully) on an effort to repurpose a 2020 pandemic-trough valuation of Mullet Bay as representing fair market value as of 2017.  Likely recognizing foul play, the Ennia Group's auditing firm would not agree that Central Bank accurately and fairly depicted the financial condition of this company.

18.     Thus, despite the clear and admitted solvency of the Insurance Assets, Central Bank has refused to return them (or the valuable non-regulated companies) to their US Shareholders and has instead doubled down, dominated their operations, and begun the looting of PIBV's assets.

### Who Is Central Bank?

19.     Central Bank serves as the common agent for the governments of Sint Maarten and Curaçao.  In furtherance of Sint Maarten's agenda to "give" Plaintiff's property to itself, Central Bank has begun another sham sale process—this time for exploring interest in Mullet Bay.  That process will predictably be used to justify another fire-sale price to help the government of Sint Maarten expropriate it (or sell it to another crony) without fair consideration to its rightful owners. Following the formula, Central Bank seeks to deprive Plaintiff of her 15.9% share of PIBV's valuable assets, such as the fair market value of Mullet Bay, just as it did with Banco di Caribe.

20.     Under the Emergency Regulation, Central Bank has been installed as the management of the Insurance Assets and has unfettered control over their operation.  Central Banks' unlawful and continued takeover of PIBV's seized assets and subsequent misappropriation of their assets lack any legal justification.  The Insurance Assets have never been insolvent and have been restored to regulatory compliance for nearly two years (without any need of additional capital, let alone to sell off PIBV's long-term investment assets).  Defendant's conduct constitutes an expropriation in violation of international law as well as a violation of United States common law for which Plaintiff is entitled to compensation.

### THE PLAYERS

21.     At various times, Central Bank acted through, among others, Jardim, Kelvin Kleist ("Kleist"), Richard Doornbosch ("Doornbosch"), and Elisabeth Grimm ("Grimm").  Each of these individuals were appointed and authorized by Central Bank to use PIBV's Ennia Group to achieve

political goals of Defendant, and to benefit the private interests of individuals aligned with them—like Banco di Caribe purchaser Gregory Elias ("Elias")—rather than to act in the best interests of PIBV and the US Shareholders, including Dr. Ansary.

22.     Jardim and Kleist had a history of dealings with the largest of the US Shareholders, Hushang Ansary ("HA").  As relevant to this action, on or about May 31, 2018, Jardim and Kleist agreed with HA on an internal restructuring of the Ennia Group (the "May 31, 2018 Restructuring Agreement") in a manner that would restore the Insurance Assets to full regulatory compliance in the wake of the new regulatory laws.  The financial aspects were simple:  EC Holding and EC Investments had sufficient cash and marketable securities in New York to fully repay any insurance policyholder premiums loaned to those entities for investment.  Upon repayment of these related-party receivables, the Ennia Group would move Banco di Caribe and/or a portion of SunResorts to be held directly by one of the Insurance Assets, in a cashless restructuring that *did not require the sale of any assets*.  Upon completion of the May 31, 2018 Restructuring Agreement, the Ennia Group would be restored to compliance with the new regulatory laws for the benefit of all stakeholders, including the US Shareholders.

23.     Significantly, as relevant to the conduct of Central Bank following the Emergency Regulation, Central Bank had full corporate authority and power to implement the previously agreed May 31, 2018 Restructuring Agreement.  Indeed, that is exactly what Jardim announced he would do—following six-months of study—at the press conference following the Emergency Regulation.

24.     Upon information and belief, step one was promptly completed:  Acting for EC Holding and EC Investments, Central Bank obtained authority from a US Bankruptcy Court in New York to repay (actually, prepay) approximately $280 million held in investment accounts of

EC Holding and EC Investments to the Insurance Assets.  But Central Bank then refused to follow through on the cashless components of the restructuring.  Rather than clean up the ownership structure on the books that had built up over a decade due to Central Bank's-own-required "flip" in ownership of Banco di Caribe and SunResorts, Jardim and Kleist saw an opportunity for personal and financial gain.  Why not keep the books unreconciled, and use them to obscure the true financial condition of the Ennia Group?

25.     The June 2022 sale of Banco di Caribe to Jardim's crony Elias (for tens of millions of dollars less than even the bank's book value) was accomplished with the assistance and encouragement of DNB and completed without a legitimate marketing process, and without even consulting the bank's experienced management team who knew the bank and its fair market value best.  Upon information and belief, Jardim (aided by Grimm) pushed through the ill-advised sale even after ING Bank—Banco di Caribe's long-time worldwide correspondent bank—told them they would terminate their relationship if Banco di Caribe were acquired by Elias.  Despite the significance of this startling communication, which would make any rational person nervous, Jardim and Grimm barreled ahead with the hurried sale.  To make matters worse, the Central Bank of Aruba—another important stakeholder of Banco di Caribe whose opinion should have mattered—outright vetoed Elias as the ultimate owner of Banco di Caribe's Aruba subsidiary.  As a result, Banco di Caribe had to quickly sell off at a further-depressed price its Aruba operations.

26.     Jardim, Kleist, and Grimm, in their capacity as Central Bank employees, were all appointed as a manager of and/or advisor to the Seized Companies following the Emergency Regulation.  Doornbosch came into the picture following the Emergency Regulation and is the current President of Central Bank.  Through their concerted conduct, Doornbosch, Jardim, Kleist,

and Grimm have breached their fiduciary duties to Dr. Ansary and the other US Shareholders by, among other things:

- failing to complete the May 31, 2018 Restructuring Agreement as promised, despite having all corporate authority to do so;

- wasting company assets (including millions of dollars on legal and financial professionals to formulate an alternative path that would take advantage of the coincidental housing of Plaintiff's long-term investment assets within EC Investments);

- causing the unnecessary, ill-timed, and below-market-value sale of Banco di Caribe to an indisputably unsuitable purchaser (which further destroyed value);

- operating the Ennia Group without requisite transparency, including by failing to timely publish financial statements as required by Curaçao law and a US court order; and

- refusing to return the shares in SunResorts to Dr. Ansary and other US Shareholders in furtherance of Sint Maarten's agenda to enrich itself by giving Mullet Bay "back to the People."

27.     Upon information and belief, with Banco di Caribe now in friendly hands, Jardim is in the process of leaving Central Bank so he may 'cash in' on his favor of selling to Elias at a bargain basement price.  Upon information and belief, Elias has offered Jardim rich personal compensation to become Banco di Caribe's new President—a *quid pro quo* all too familiar to Jardim from his prior public post as Minister of Finance, which was marked by scandal.  Despite his goal of personal gain, Jardim's unlawful conduct while in control of PIBV's Ennia Group remains attributable to Defendant.

## **THE PARTIES**

28.     Plaintiff Dr. Nina Ansary is a citizen of the United States and a resident of the State of California.

29.     Defendant Central Bank of Curaçao and Sint Maarten is a legal entity organized under the laws of Curaçao with its principal place of business in Curaçao and is an agency or instrumentality of the Country of Curaçao and the Country of Sint Maarten and a foreign state under the FSIA.  Curaçao and Sint Maarten share a common currency, the Antillean Guilder, and a common Central Bank. Central Bank's operations are authorized by the Central Bank Statute for Curaçao AB 2010, no. 85 and the Central Bank Statute for Sint Maarten AB 2010 GT, no. 24.  It is the only institution entitled by law to issue money in Curaçao and Sint Maarten and manages the foreign exchange reserves of Curaçao and Sint Maarten, including the regulation of transfer of payments between residents of Curaçao and Sint Maarten and non-residents.  The governments of Curaçao and Sint Maarten exercise control over Central Bank, by, among other things, appointing the Chairman of the Supervisory Board of Central Bank.

30.     Central Bank has systematically and continuously engaged in commercial activities, both in the United States and outside the United States causing a direct effect in the United States and has received and continues to receive substantial benefits from these commercial activities.  In addition to its routine participation in the international banking system, Central Bank: (i) has continued to operate PIBV's Seized Companies, all for-profit commercial entities owned by the US Shareholders, since the seizure and despite having long ago fulfilled any conceivable regulatory objective; (ii) took on the role of financial manager of EC Holding and EC Investments' US accounts and arranged for the Seized Companies to access the US Bankruptcy Courts to take control of accounts and manage those investments for commercial gain; (iii) engaged a Miami-based investment banking firm, BroadSpan Capital, to orchestrate the unnecessary sale of Banco di Caribe purely for purposes of financial gain, and failed to account for and remit proceeds from

that sale to the US Shareholders, including Plaintiff; and (iv) is currently seeking to sell, transfer, or expropriate Mullet Bay strictly for financial gain.

31.     Non-party Richard Doornbosch is a citizen of the Kingdom of the Netherlands and a resident of Curaçao.  He has served as President of Central Bank since August 2020 when he was approved by the governments of Curaçao and Sint Maarten.  Upon information and belief, Doornbosch directed and was principally responsible for actions taken by Central Bank from August 2020 to date as a consequence and in furtherance of the seizure.

32.     Non-party Jose Jardim is a citizen of the Kingdom of the Netherlands and resident of Curaçao and the Executive Director of Central Bank, a position he was appointed to in November 2017 by the governments of Curaçao and Sint Maarten.  From January 1, 2020 until August 7, 2020 Jardim was the acting president of Central Bank.  Upon information and belief, Jardim directed and was principally responsible for Central Bank's appropriation of the Seized Companies following the Emergency Regulation, as well as all actions taken by Central Bank as a consequence and in furtherance of the seizure.  In particular, upon information and belief, Jardim arranged for Central Bank's retention of BroadSpan Capital to orchestrate the sale of Banco di Caribe and participated in numerous in-person meetings in Miami, Florida with BroadSpan Capital and prospective purchasers regarding the marketing and sale of Banco di Caribe.

33.     Upon information and belief, BroadSpan Capital took its instructions on how to carry out its investment banking services to sell Banco di Caribe from Jardim, Grimm and representatives of DNB from its principal office, in Miami, Florida.  Among other activities, BroadSpan Capital purported to market Banco di Caribe to a private equity firm in New York, but soon abandoned that effort upon instructions from Jardim and/or representatives of DNB to focus solely on their favored local businessman (Elias) as purchaser.

34.     Non-party Kelvin Kleist is a citizen of the Kingdom of the Netherlands and resident of Curaçao and is the Manager of the Department of Financial Stability of Central Bank.  This division is responsible for taking actions to maintain financial stability and the execution of the macroprudential strategy of Central Bank.  Kleist was appointed as a manager of and/or advisor to the Seized Companies following the Emergency Regulation by which Central Bank assumed control over these entities.   Upon information and belief, Kleist was responsible for the management of the Seized Companies as a consequence and in furtherance of the seizure.

35.     Non-party Elisabeth Grimm is a citizen of the Kingdom of the Netherlands and a resident of Curaçao and is the Manager of the Department of Resolution of Central Bank.  This department is responsible for intervention and enforcement of financial institutions in circumstances of serious and/or persistent problems and the wind-up or restructuring of an institution in instances of discontinuity.  Grimm was appointed as a manager of and/or advisor to the Seized Companies following the Emergency Regulation by which Central Bank assumed control over these entities.   Upon information and belief, Grimm was responsible for the management of the Seized Companies as a consequence and in furtherance of the seizure.  In particular, upon information and belief, Grimm arranged for Central Bank's retention of BroadSpan Capital to orchestrate the sale of Banco di Caribe.

36.     Non-Party DNB is the central bank of the Netherlands. DNB also has regulatory control over banks operating in the Caribbean Netherlands, including Bonaire and provided regulatory approval of the sale of Banco di Caribe's operations in Bonaire to Elias.  Upon information and belief, the Kingdom of Netherlands and DNB exercise financial supervision over the countries of Curaçao and Sint Maarten, including Central Bank, and regularly serve as a lender to  Central Bank.  Upon information and belief, DNB has been in discussions with Central Bank

throughout the Emergency Seizure, and was aware of and actively involved in the conduct alleged herein, including by instructing Central Bank and/or BroadSpan Capital to orchestrate and complete the unnecessary sale of Banco di Caribe.

37.     Venue is proper in this district under 28 U.S.C. § 1391(f)(4).

38.     The Court has subject matter jurisdiction over this action pursuant to Section 1605(a)(3) of the FSIA, which grants federal district courts subject matter jurisdiction over foreign states and their instrumentalities in cases:

> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

39.     The Court also has subject matter jurisdiction over this action pursuant to Section 1605(a)(2) of the FSIA, which grants federal district courts subject matter jurisdiction over foreign states and their agencies and instrumentalities in cases:

> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

40.     Dr. Ansary and other shareholders invested in PIBV, capitalizing it, contributing previously owned assets, and building it into a $700 million enterprise.  In addition to being a 15.9% shareholder, Dr. Ansary is a non-executive director of PIBV.

41.     Dr. Ansary's right of ownership in PIBV constitutes a valuable property right recognized and protected by law.

42.     Dr. Ansary enjoys direct rights as a shareholder including rights to profit from the company (by payment of dividends), and to exert control by exercising voting rights within the company's shareholders meeting, and to control the liquidation, and disposition of its assets.  As a holding company, its entire purpose and value derives from the ability to control the assets that are its companies.

43.     Central Bank has targeted Dr. Ansary's valuable rights in PIBV by taking measures to effect an indirect takeover of PIBV, stripping it of all of its value and leaving it a worthless shell with no assets to control whatsoever.  Central Bank has accomplished these ends by taking over the management of all of PIBV's businesses, liquidating and looting others, and leaving the ultimate US owners with nothing of value.  PIBV's long-time assets—its insurance businesses, a banking operation, and valuable real estate—have been commandeered, operated for private and political gain, or sold (or readied for sale) at fire-sale prices to government cronies.

44.     As Dr. Ansary is a citizen and resident of the United States, her ownership rights in PIBV necessarily reside with her in the United States.

45.     Central Bank has expropriated these rights in order to exercise de facto control over PIBV and its assets in connection with its existing and continuing commercial activity in the United States.

46.     Central Bank, which is engaged in separate commercial activity in the United States through its US deposits, investments and reserves, has exercised control over the ownership rights to operate various PIBV enterprises, including the lucrative insurance businesses, banking business, and real estate.

47.     Central Bank, as described above, has: (i) continued to operate PIBV's Seized Companies, all for-profit commercial entities, since the seizure despite having long ago fulfilled

any conceivable regulatory objective; (ii) taken over the role of financial manager and managed investment accounts in New York for commercial gain; (iii) engaged a Miami-based investment banking firm, BroadSpan Capital, to orchestrate the unnecessary sale of Banco di Caribe purely for purposes of financial gain, and failed to account for and remit proceeds from that sale to the US Shareholders, including Plaintiff; and (iv) is currently seeking to sell, transfer, or expropriate Mullet Bay strictly for financial gain.

48.     These commercial activities continue in the United States and had and continue to have a significant direct effect in the United States.

49.     These effects include the tens of millions of dollars transferred from PIBV companies' accounts in the United States and the hundreds of millions of dollars of investment losses to Dr. Ansary and others in the United States.

50.     As is now evident, this activity was not a legitimate use of sovereign regulatory powers, but commercial activity designed to enrich private interests.

51.     The present action is premised, *inter alia*, on Defendant's expropriation of Dr. Ansary's ownership rights in PIBV within the meaning of 28 U.S.C. § 1605(a)(3) and the commercial activities of Central Bank within the meaning of 28 U.S.C. § 1605(a)(2) from which Central Bank is not immune from suit in this Court.

52.     This Court may exercise personal jurisdiction over the Defendant Central Bank, pursuant to 28 U.S.C. § 1330(b).

## APPLICABLE TREATY AND INTERNATIONAL LAW

53.     In 1956, the United States of America and the Kingdom of the Netherlands entered into the "Treaty of Friendship, Commerce and Navigation between the United States of America and the Kingdom of the Netherlands" (the "Dutch-American Friendship Treaty"). The Dutch-American Friendship Treaty is a bilateral agreement entered into in order to encourage closer

economic and cultural relations between both countries and their citizens.  The Dutch-American Friendship Treaty is based upon the principles of national and unconditional most-favored-nation treatment reciprocally accorded to the citizens of the other country.   The Dutch-American Friendship Treaty is also binding on Curaçao and Sint Maarten, which are constituent countries of the Kingdom of the Netherlands.

54.     Under Article VI(4) of the Dutch-American Friendship Treaty, the property of nationals of either party shall not be taken within the territories of the other party except for a public interest and with prompt payment of just compensation.   Specifically, Article VI(4) provides:

> Property of nationals and companies of either Party shall not be taken within the territories of the other Party except for a public interest, nor shall it be taken without the prompt payment of just compensation.  Such compensation shall be in an effectively realizable form and shall represent the equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

55.     In addition, Article VI(5) provides for "most-favored-nation" treatment for Americans' investments in Curaçao and Sint Maarten.  Specifically, Article VI(5) provides:

> Nationals and companies of either Party shall in no case be accorded, within the territories of the other Party, less than national treatment and most-favored-nation treatment with respect to the matters set forth in paragraphs 2 and 4 of the present Article. Moreover, enterprises in which nationals and companies of either Party have a substantial interest shall be accorded, within the territories of the other Party, not less than national treatment and most-favored-nation treatment in all matters relating to the taking of privately owned enterprises into public ownership and to the placing of such enterprises under public control or administration.

56.     Moreover, Article VI(3) of the Dutch-American Friendship Treaty provides that "[n]either Party shall take unreasonable or discriminatory measures that would impair the rights or interests within its territories of nationals and companies of the other Party, whether in their

capital, or in their enterprises and the property thereof, or in the skills, arts or technology which they have supplied."

57.     Article V of the Dutch-American Friendship Treaty additionally provides that "Nationals and companies of either Party shall be accorded national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."

58.     The Dutch-American Friendship Treaty thus commits Netherlands, Curaçao and Sint Maarten, as a matter of Dutch law, US law, international law, and public policy, to provide certain fundamental protections for the property of US citizens, including the right to a fair hearing and just compensation if property is taken.

59.     Defendant violated these covenants under the Dutch-American Friendship Treaty, as well as other similar sources of international law that provide protection from unlawful appropriation of private property, by targeting Dr. Ansary and other US investors for retaliatory action, illegally taking control of PIBV's Seized Companies, retaining control long after any conceivably valid regulatory purpose, and preventing their shareholders from accessing the assets of these entities without compensation for their usage.

## FACTUAL BACKGROUND

60.     Dr. Ansary is an internationally recognized Iranian-American author, historian and women's rights activist.  Her father, HA, is a businessman who invests in various ventures around the world through entities he owns or controls.  Dr. Ansary is an ultimate shareholder of PIBV in which she holds a 15.9% stake.

### A.        Curaçao Central Bank Insurance Regulatory Scheme

61.     The National Ordinance on the Supervision of the Insurance Industry ("Landsverordening Toezicht Verzekeringsbedriif"; the "LTV"), is the Curaçao law that provides for licensing and regulation of insurance companies in Curaçao.

62.     Under the LTV, Central Bank is responsible for supervising and licensing "insurers" and ensuring that they remain solvent and able to satisfy obligations to policyholders.

63.     The LTV defines an "insurer" as any person who carries out "insurance business."  The term "insurance business" is defined as "entering into life [or non-life] insurance contracts as a business for its own account."  Neither the LTV nor any other law or regulation grants Central Bank any licensing or regulatory authority over companies that do not "enter into life [or non-life] insurance contracts as a business".  Neither EC Holding nor EC Investments was ever operating as an insurance company and Central Bank's seizure of them could only be justified (if at all) as a temporary adjunct to its regulatory authority over the Insurance Assets.

64.     The LTV provides for a proceeding known as an "Emergency Regulation" ("noodregeling") which allows Central Bank to petition the Curaçao Court of First Instance to grant Central Bank control of an insurance company in serious financial distress for the purpose of restructuring it.  The LTV does not permit Central Bank to take control of any business that is not an insurance company.

### B.        History and Corporate Structure of The Ennia Group

65.     PIBV owns 100% of the shares of EC Holding (and thereby the Ennia Group). SunResorts has been owned by members of Dr. Ansary's family for decades and long prior to the acquisition of the Ennia Group in 2006.  In 2005, PIBV acquired Banco di Caribe.  In 2006, Banco di Caribe acquired EC Holding, which in turn owned the Insurance Assets.

66.     In 2009, Central Bank, as the regulator of the Insurance Assets, required the US Shareholders to "flip" the ownership structure of the Ennia Group so that Banco di Caribe would be owned by (or at least separate from) the Insurance Assets rather than be their owner.  In a cashless internal reorganization transaction, the US Shareholders complied with Central Bank's directive and EC Holding became the owner of Banco di Caribe as well as the newly created EC Investments entity and the Insurance Assets side-by-side.  At that same time, SunResorts was pushed down so as to be "owned" by EC Investments as an accounting matter, although the US Shareholders were not actually paid for transferring their interest in SunResorts to EC Investments, or for transferring their interest in Banco di Caribe to EC Holding.

67.     The "flip" can be illustrated as follows:



Following the "flip" and continuing to this day, PIBV own 100% of EC Holding and EC

Holding in turn owns 100% of EC Investments.  The corporate structure of the Ennia Group at

the time the Emergency Regulation was imposed is as follows:



68.    EC Investments was established in 2006 shortly after the US Shareholders acquired EC

Holding. EC Investments' business included borrowing funds (with interest) from the Insurance

Assets and investing those funds in the United States to generate investment returns for the

enterprise.

69.    Over the course of the next decade, the Insurance Assets loaned a portion of their funds

to EC Investments, which then invested those funds in the United States and generated substantial

investment returns.  Central Bank, as the regulator of the Insurance Assets, was aware of and

approved these intercompany loans.  Every year from 2006 until the unexpected seizure of PIBV's

Seized Companies in 2018, Central Bank approved for publication the financial statements of the

three Insurance Assets and were thus fully apprised of the financial status and health of these

entities.

70.     EC Investments recorded an intercompany payable for all the funds it borrowed from the Insurance Assets, timely paid interest on those loans, and at all times had sufficient assets to repay the principal on such loans when due.

### C.     Central Bank Adopts New Regulations in 2015

71.     In 2015, Central Bank adopted new regulations applicable to the Insurance Assets that excluded amounts owed by related parties from any insurance company's required regulatory capital amounts. Thus, overnight, when the new regulations were adopted, the Insurance Assets were no longer in compliance with regulatory requirements because of the outstanding loans to EC Investment.  However, none of the Insurance Assets had ever defaulted on any obligation to a policyholder, had liquidity problems, or were otherwise financially insecure.  In 2016, Central Bank formally notified EC Holding that the Insurance Assets had three years to come into compliance with the new regulations, subject to several conditions.  Thereafter, and continuing into June 2018, Central Bank, acting through defendant Jardim, negotiated an internal restructuring and reorganization of PIBV's Seized Companies with HA, EC Holding's majority shareholder. Unbeknownst to Plaintiff, under the May 31, 2018 Restructuring Agreement between Jardim and Kleist, acting for Central Bank, and HA, acting for EC Holding, various intercompany balances were to be unwound restoring the Insurance Assets to regulatory compliance.  The May 31, 2018 Restructuring Agreement memorializing this agreement reflects the specific steps that would achieve the restructuring.   The primary feature of the restructuring was the early return of funds that one of the three Insurance Assets, Ennia Caribe Leven, had loaned to EC Investments for further investments in US companies.  These funds were held in cash and marketable securities in EC Investments' account at Merrill Lynch in New York.  The restructuring agreement also contemplated that Ennia Caribe Leven would become the owner of Banco di Caribe, which in turn would own the shares in SunResorts, and any intercompany payables that had built up over the

years from the original "flip" in ownership would be canceled. Following these and other contemplated internal transactions, all three Insurance Assets would be in regulatory compliance. As relevant to this lawsuit, Central Bank agreed that selling Banco di Caribe or Mullet Bay was unnecessary to restore the Insurance Assets to regulatory compliance.

72.     When the time came to execute the definitive documentation to implement the restructuring, however, the parties refused to sign for reasons unknown to Dr. Ansary. Days later, HA withdrew $100 million from EC Investments and transferred it outside of the Ennia Group to one of his privately held companies, in which Plaintiff has no interest. Although HA returned the $100 million directly to Ennia Caribe Leven days later, as explained below, Central Bank had by then decided to impose an emergency seizure, citing, in part, the $100 million withdrawal and unpaid intercompany loans as the basis for a financial emergency.

### D.     Application of the Emergency Regulation

73.     In order to obtain plenary control over PIBV's Ennia Group entities that owed the intercompany balances, Central Bank abruptly seized six Ennia Group entities, not just the Insurance Assets that were subject to Central Bank regulation. The stated purpose of doing so was to ensure the repayment of such balances.

74.     On July 3, 2018, Central Bank, unexpectedly and without prior notice to Plaintiff, filed an application with the Court of First Instance of Curaçao seeking imposition of the Emergency Regulation on the three Insurance Assets as well as two other Ennia Group entities, EC Investments and EC Holding.[10] In addition to the (subsequently returned) $100 million withdrawal made by HA, Central Bank (falsely) claimed that "Ennia has a serious solvency deficiency that is only getting worse" and alleged harm would befall Ennia from the riskiness of investments made with

---

[10]  Two days later, a sixth entity, EC Holding N.V. was subjected to the Emergency Regulation.

the Insurance Assets' cash, which comprised stocks and bonds of corporate entities, as opposed to lower-risk investments. Notwithstanding these financial concerns, the Insurance Assets had never defaulted on any obligation to any policyholder.

75.    Central Bank claimed that it had jurisdiction over the three unregulated companies (EC Investments, EC Holding, and EC Holding N.V.) because they "operated the business of insurance" by managing the investment of cash generated from policyholder premiums through the intercompany loans. Whatever the validity of this assertion at the time, all cash generated by policyholder premiums and invested in intercompany loans have been (or could be, with the vast sums of cash on hand) fully repaid to the Insurance Assets. Following the difficult economic challenges caused by the COVID-19 pandemic, it is now clear that the real reason Central Bank continued to hold onto EC Investments and EC Holding was that these entities had valuable assets over which Central Bank wanted to keep control, namely SunResorts and Banco di Caribe.

76.    At hearings on July 4 and 6, 2018, held on just a few hours' notice before a Curaçao court, Central Bank moved for control over the regulated Insurance Assets and the unregulated entities (EC Investments, EC Holding, and EC Holding N.V.).

77.    Within a few hours of the filing of Central Bank's application to wrest control of these Ennia entities from their rightful owners, the Court of First Instance of Curaçao imposed the Emergency Regulation on both the Insurance Assets and EC Investments and EC Holding. Under Curaçao law relating to the supervision of insurance companies, the order of the Curaçao Court of First Instance was not subject to appeal.

78.    Central Bank then exercised its authority pursuant to the LTV and Emergency Regulation. It removed all then-current members of the supervisory board and managing board of directors for these entities and, through Jardim, Kleist, and Grimm, took up the day-to-day

management of the affairs of each PIBV company that was now subject to the Emergency Regulation.

79.     Central Bank's control of PIBV's Seized Companies was absolute. Although Central Bank's control was supposed to be limited to restructuring the Ennia Group to bring the Insurance Assets into technical compliance with its new capital regulations, Central Bank used its authority to usurp, direct and control the operations, facilities, books, and records of the Insurance Assets, EC Investments and EC Holding.  Central Bank's total domination of PIBV's Seized Companies remains as absolute and opaque today as it was in July 2018.

80.     Following the emergency measure imposed in Curaçao, Sint Maarten's Prosecutor's Office placed liens on assets of the companies located there, including SunResorts, even though these entities were not subject to Central Bank regulation.[11]

81.     After the Emergency Regulation was put in place, Central Bank admitted in a press conference that EC Investments and EC Holding were "not under the supervision of the Central Bank" and that it only took over EC Investments and EC Holding because doing so would enable Central Bank to restructure the Insurance Assets "a lot faster."[12]  Jardim also admitted that although Banco di Caribe, a separately managed entity acquired by PIBV before they purchased their interests in the Ennia Group, did not fall under the emergency measure, it intended to utilize the Emergency Regulation to "exert indirect influence on Banco di Caribe."[13]  Central Bank did much

---

[11] *Sun Resorts Lien Follows Ennia Emergency Ruling*, THE DAILY HERALD (09 July 2018), https://www.thedailyherald.sx/islands/n-sun-resorts-lien-follows-ennia-emergency-ruling.

[12] *See*  Exhibit A Press Conference Transcript ("the investment entity, which is not under the supervision of the Central Bank" and "A key point in this is also that we have not requested the emergency measure only for the 3 companies of Ennia, we have also requested it for the holding and for the investment company, precisely because these were the key for us to be able to restructure the group a lot faster.").

[13] *See* fn. 11.

more than "exert indirect influence on Banco di Caribe", however; as explained below, it worked with a US-based investment bank to orchestrate the sale of the bank—in the midst of the global pandemic—at a depressed price to Jardim's crony, Gregory Elias, permanently dispossessing PIBV and thus Dr. Ansary of their interest in that valuable property.

82.     Central Bank has maintained control of the Seized Companies to this day, without requisite financial (or other) transparency in breach of Curaçao law and US court orders, and notwithstanding that any emergency that may have justified the initial intervention of the regulated Insurance Assets has long ceased to exist.

83.     DNB actively assisted Central Bank in its supervision of the Seized Companies. Central Bank has limited resources and capacity and has called on DNB to assist and participate in its operation and control of the Seized Companies and to complete the Banco di Caribe sale.

### E.     Chapter 15 Proceedings

84.     Central Bank, also under the guise of restructuring the Insurance Assets, utilized the US Bankruptcy Court to unlawfully take control of EC Investments' portfolio and accounts at Merrill Lynch in New York.

85.     On September 25, 2018, R.M. Hermans, the Foreign Representative appointed by the Seized Companies at the direction of Central Bank, filed six separate applications in the United States Bankruptcy Court for the Southern District of New York under Chapter 15 of the United States Bankruptcy Code for recognition of the Emergency Regulation (the "Chapter 15 Petitions"). Central Bank filed the Chapter 15 Petitions in order to gain access to $280 million dollars in accounts at Merrill Lynch in New York.  The matters were jointly administered in an action captioned *In re: ENNIA Caribe Holding N.V., et al., Debtors in a Foreign Proceeding*, Case No. 18-12908 (MG), and the application as to each entity was granted on December 20, 2018.

86.     Central Bank was then granted unfettered access to approximately $280 million in liquid assets which could be (and were) made available to repay the loans that the Insurance Assets had made to EC Investments.  On January 29, 2019, the Chapter 15 court granted Discretionary Relief allowing the Insurance Assets and Central Bank to access EC Investments' assets. In that order, the Chapter 15 court expressly required Central Bank to make "monthly reporting from the CBCS regarding the balances in the bank accounts held by ECL [Ennia Caribe Leven N.V.], ECI [EC Investments] and ECH [EC Holding], including amounts segregated in accordance with this Order."[14]

87.     Since that time, Central Bank has taken on the role of investment manager and managed EC Investments' United States investments, including making investment decisions on behalf of EC Investments and selling its United States holdings.  Central Bank's actions have resulted in the complete taking of a substantial portion of EC Investments' assets.  The poor and inexperienced management of EC Investments' assets caused damage to EC Investments' ultimate shareholders, including Dr. Ansary.

88.     Upon information and belief, Central Bank ultimately used the funds recovered from the investment accounts to repay the intercompany receivables generated from investing cash generated from policyholder premiums, thereby curing whatever liquidity concern may have existed about the Insurance Assets.

### F.    Defendant's Refusal to Disclose Financial Information in Violation of Law and Court Orders

89.     In an effort to justify its continued exercise of absolute and unlawful control over the PIBV Seized Companies, Central Bank has refused to make required financial disclosures

---

[14]  *In re: ENNIA Caribe Holding N.V., et al.*, Debtors in a Foreign Proceeding, Case No. 18-12908 (MG) (Bankr. S.D.N.Y.) , Dkt. 95 at p. 7.

regarding the Seized Companies despite that Curaçao law and the Chapter 15 court expressly required and ordered those disclosures, depriving the US Shareholders of information regarding their investments.

90.     Central Bank inexplicably has refused to publish audited financial statements for the Insurance Assets since its seizure of the businesses, or for EC Holding, EC Investments, or SunResorts, and has held no meetings of shareholders.  To illustrate, Ennia's web site,[15] which is controlled by Central Bank, includes current financial information and annual reports for Ennia's separate insurance companies in Aruba, but not those in Curaçao.  Plaintiff only recently learned through other litigation that audited financial statements for the three Insurance Assets were actually available in September and October 2021 but have apparently never been posted to  the ENNIA website or otherwise made publicly available.

91.     As Plaintiff expected, the newly revealed audited financial statements of two of the three Insurance Assets unequivocally admit their solvency and regulatory compliance going back even prior to the sale of Banco di Caribe—yet these companies remained in the grip of Central Bank as part of the scheme to maintain control long enough to dispossess Plaintiff of her interest in that investment asset.  In an *unaudited* financial statement of the third Insurance Asset (Ennia Caribe Leven), defendant Central Bank attempted unsuccessfully to play with words and convince its auditor, EY, that this company's liabilities could potentially exceed its assets, but it would nevertheless be restored to regulatory compliance over time—even without any permanent increase to its capital.  Central Bank urged EY to trust in the fact that there are ongoing discussions (while hiding the particulars from its auditor and the public) among Central Bank and the countries

---

[15]  *Financial Highlights*, ENNIA, https://www.ennia.com/en/about-ennia/financial-highlights/ (last visited Jan. 16, 2023).

30

of Curaçao and The Netherlands.  Unsatisfied with the level of sufficiently reliable audit evidence provided, EY refused to credit Central Bank's portrayal of Ennia Caribe Leven as either fair or accurate.

92.     Central Bank's unjustified refusal to publish the Seized Companies' financial statements and make other required disclosures openly violates Curaçao law and obligations ordered by the Chapter 15 court, including obligations to make monthly reporting imposed by the Chapter 15 court for the benefit of the US Shareholders.

**G.     Defendant Unlawfully Retains Control Long After Any Emergency Ceased to Exist**

93.     Although Central Bank initially seized PIBV assets EC Holding and EC Investments under the guise of restoring the Insurance Assets "solvency," it has now become clear that Central Bank's  plan to retain the Plaintiff's private property for its own economic and political purposes, having nothing to do with the financial health of the Insurance Assets, or non-existent policyholder shortfalls or liquidity concerns.  Importantly, prior to Central Bank's illegal taking of the Seized Companies, the Insurance Assets had not defaulted on any obligation to policyholders and the claimed financial deficiencies could have easily been resolved through an agreed upon consensual restructuring.

94.     Central Bank cannot deny that whatever alleged solvency issues may have existed in 2018 were resolved when EC Investments repaid its payables to the Insurance Assets, which upon information and belief occurred no later than the first quarter of 2021.

95.     According to the audited financials for ENNIA Caribe Schade NV as of December 31, 2018 (released in October 2021), "In the first quarter of 2021, the company was able to convert a significant part of the Balances due from Affiliates (intercompany balances) into admissible assets resulting in a solvency surplus, thereby complying with required solvency margin by the CBCS."

96.     The same is true for ENNIA Caribe Zorg NV.  This entity's audited financials as of December 31, 2017 (released in September 2021) explain "In the first quarter of 2021, the Company was able to convert a significant part of the Balances due from Affiliates into admissible assets, thereby complying with the required solvency margin by the CBCS."

97.     This demonstrates that by managing the intercompany balances, solvency was restored to these entities without the need for any additional capital.

98.     In a press release issued on October 1, 2021, Central Bank admitted as much, although the backup details were still hidden from Plaintiff:

> Meanwhile, the solvency of ENNIA Caribe Schade NV and ENNIA Caribe Zorg NV **is up to par again. These businesses are thus fully able to meet their obligations and are functioning normally**. Taking the group-wide approach of the restructuring into account, release of these entities from under the emergency measure is being assessed.[16]

99.     Central Bank has also publicly acknowledged "The restructuring of ENNIA Caribe Leven NV is also progressing", although Central Bank has consistently withheld the true financial information about this entity, which has even prevented its auditor from reaching a conclusion about the fairness of Central Bank's portrayal of its assets and liabilities.

100.     Nevertheless, Central Bank has acknowledged "CBCS and ENNIA are working to strengthen the financial position of the insurer in multiple ways. Among others, a prudent investment policy has been developed with the aim to support the long-term obligations of the insurer and an independent investment committee has been appointed with the goal to invest the incoming premiums in accordance with the renewed investment policy."

101.     Ennia's financial health is so robust that Ennia has excess funds to support its first-ever Olympic athlete.  In February 2022, it was announced that "ENNIA will support Terrence Agard

---

[16]     *The Restructuring of the ENNIA Group*, ENNIA (October 1, 2021), https://www.ennia.com/en/about-ennia/news/2021/restructuring/ (emphasis added).

in his preparations and competition program en route to the Paris Olympic Games in 2024. For 2022, these included the Dutch Indoor National Championship in February, the Indoor World Cup Belgrade in March, The World Cup in Oregon in July, the European Cup in Munich in August and the Odesur Games in Chili in October."[17]   The cost of these 5 international trips for Mr. Agard in 2022 alone no doubt was substantial and surely would not be justified if Ennia truly was insolvent. Ennia has also provided sponsorship to Nacional Soccer Club Aruba.[18] Central Bank's philanthropy with Plaintiff's assets is not limited to sports.  Ennia's web site touts that "we support charities and projects that contribute to a healthy and sustainable society" and invites individuals and non-profit organizations to apply for a donation or sponsorship.[19]  While Plaintiff would gladly support appropriate charities if her assets were restored to their rightful owners, it is fundamentally unfair for Central Bank to deprive Plaintiff of her assets under the guise of insolvency while divvying them up to favored causes.

102.    Notwithstanding this obvious return to financial health, Central Bank has vigorously resisted efforts to release the Seized Companies from its clutches.  In May 2021, PIBV petitioned a Curaçao court for the release of the Seized Companies from regulatory supervision, citing lack of progress and a three-year long delay in completing the restructuring without justification. Central Bank successfully opposed the application claiming, among other things, that additional

---

[17] *Terrence Agard Sponsored by ENNIA Until the 2024 Olympic Games*, ENNIA (February 27, 2022), https://www.ennia.com/en/about-ennia/news/2022/terrence-agard-sponsored-by-ennia-until-the-2024-olympic-games/.

[18]  *Nacional Soccer Club Aruba – Youth Division (U5) Closes Together with ENNIA the Socces* [*sic*] *Season*, ENNIA (July 12, 2022), https://www.ennia.com/en/about-ennia/news/2022/nacional-soccer-club-aruba---youth-division-u5/.

[19]  ENNIA, https://www.ennia.com/en/about-ennia/donation/ (last visited Jan. 16, 2023).

work was needed to complete the restructuring, including the need to re-value the Mullet Bay property.

103.    As another measure of financial health, the Insurance Assets can today earn substantially higher interest rates on their funds than was possible over four years ago. The 10-year treasury rate in July 2018 was 2.89 percent and today is 3.5 percent.[20]  Ennia's insurance policies and pensions (annuities) benefit from higher interest rates because the obligations are fixed and not tied to inflation, whereas the amounts that could be generated from investments in government-issued bonds has risen steadily over the past four years.  Upon information and belief, this is precisely why Central Bank has chosen to hide the two admittedly solvent Insurance Assets' financial position from sight and in part why EY could not make any sense of Central Bank's unreliable financial statements for Ennia Caribe Leven.

### H.    Defendant's Unlawful Taking of PIBV's Key Ennia Assets

104.    Despite the promise over one year ago to assess the "release of these entities from under the emergency measure," Central Bank continues to exercise complete domination over the Seized Companies, including control over the management and boards of EC Investments and EC Holding.  Central Bank has assumed all operational control over the Insurance Assets and unjustifiably maintained that control for a least a year after the Insurance Assets achieved full compliance with applicable regulations.

105.    Even more troubling, rather than return control of Banco di Caribe and SunResorts to their rightful owners including Plaintiff, Central Bank took them, kept them for its own purposes, and either disposed or are in the process of disposing of them for the benefit of Defendant and for

---

[20]                                                            MARKETWATCH,
https://www.marketwatch.com/investing/bond/tmubmusd10y?countrycode=bx (last visited Jan. 16, 2023).

no legitimate business purpose.  By taking and retaining control of the Seized Companies long after any conceivable "emergency" could have existed, Central Bank unlawfully expropriated Plaintiff's property interest in those companies and assets in violation of US and international law.

106.    With respect to Banco di Caribe, Central Bank, acting at least through Jardim and Grimm, and with the active assistance of DNB, retained Miami-based BroadSpan Capital as its investment banker to market and sell Banco de Caribe.  Banco di Caribe ultimately was sold to Elias' company, United Group Holdings BV ("United") earlier this year reportedly for just 120 million Antillean Guilders, far below both the 180 million Antillean Guilders book value and actual market value of the bank, the third largest in Curaçao.  Central Bank proceeded with the unnecessary sale and accepted the sole below-market offer from United.[21]

107.    DNB was, upon information and belief, the driving force behind the Banco di Caribe sale.  DNB representatives communicated with BroadSpan Capital and others—either directly or through its emissaries—regarding the sale and assisted in arranging for the necessary support to allow Central Bank to complete the sale.  Central Bank required DNB's assistance in connection with the Banco di Caribe sale in light of the sale of the asset and its importance to the supervised Ennia Group.  DNB also serves as regulator of banks located in Bonaire, where Banco di Caribe also has operations, and was required to and did in fact approve the sale of the Banco di Caribe Bonaire operations to Elias.

108.    At the time of the sale, press reports reflect that "it seems that 'a game' is being played about the selling price. Insiders from the financial sector estimate the current book value of Banco di Caribe at around 180 million, nevertheless the agreed price for Banco di Caribe would be only

---

[21]    *The Restructuring of the ENNIA Group*, ENNIA (October 1, 2021), https://www.ennia.com/en/about-ennia/news/2021/restructuring.

120 million."[22]  This led to speculation that "it seems as if CBCS is helping the buyer" and "The financial sector wonders what 'favor' is granted after the sale."[23]  It was also reported:

> In addition, CBCS itself has two warring groups. One group absolutely does not want to sell Banco di Caribe and certainly not at such a ridiculously low price, while the other group is actually in favor of the sale."[24]

109.     United's president is the wealthy and connected businessman Gregory Elias.  Elias has been termed the "uncrowned king of the largest offshore online gambling and money laundering network in the world."  He features prominently in the infamous "Panama Papers" which triggered a Dutch parliamentary investigation of him in 2017[25] and has been said to "give[] the country [Curaçao] a bad reputation in the financial world."[26]  Central Bank and DNB nevertheless ignored these serious red flags and allowed him to acquire one of the largest banks in Curaçao at a bargain price, at the undeniable worst time to sell.

110.     Upon information and belief, contention regarding the questionable sale of Banco di Caribe to United was so severe that Central Bank personnel involved in orchestrating the sale were initially terminated by Central Bank President Doornbosch for their role in approving this highly suspect transaction, only to be reinstated days later at the urging of the DNB.

---

[22]   *Banco di Caribe Sale is Difficult*, CURACAO CHRONICLE (Sept. 29, 2021), https://www.curacaochronicle.com/post/local/banco-di-caribe-sale-is-difficult/.

[23]   *Id.*

[24]   *Id.*

[25]   *United Group Buys Banco di Caribe*, STMAARTENNEWS.COM (Sept. 18, 2021), https://stmaartennews.com/banking/united-group-buys-banco-di-caribe/.

[26]   *Research Platform Investico: "The Gambling Sector Rules in Curacao*," CURACAO CHRONICLE (May 25, 2022), https://www.curacaochronicle.com/post/main/research-platform-investico-the-gambling-sector-rules-in-curacao.

111.    Concerns regarding Elias and United were so apparent that, remarkably, the Central Bank of Aruba (which operates separate from Central Bank) vetoed the sale of Banco di Caribe-Aruba (which is a subsidiary of Banco di Caribe) to United and required that the Aruba branch be immediately resold to a suitable buyer upon the sale of the larger banking enterprise to United.  In fact, upon Central Bank revealing its plans to sell Banco di Caribe to United, the Central Bank of Aruba felt compelled to announce that it had not yet authorized the sale of Banco di Caribe-Aruba to United Group Holdings and ultimately disapproved of United owning a bank in Aruba.

112.    The sale to United also caused ING Bank (the reputable Dutch multinational bank) to stop serving as Banco di Caribe's long-time correspondent bank for international transactions due to concerns about its new owner.[27]

113.    Notwithstanding these objections by a neighboring bank regulator and an international bank, Central Bank forged ahead and completed the sale in June 2022[28] as the ostensible representative of EC Holding and claimed that "The sale of Banco di Caribe to United is an important step in the financial recovery of the ENNIA Group. The all-cash proceeds will immediately be made available to ENNIA Caribe Leven N.V., thereby contributing to a lower risk profile and the optimization of its investment portfolio, all for the benefit of its policyholders. Moreover, the sale will allow the ENNIA Group to fully focus on its insurance business."[29]  In its press release announcing the Banco di Caribe sale to United, Central Bank deliberately

---

[27] *New Correspondent Bank for Euro and GBP Transfers*, Banco di Caribe, https://bdc-curacao.spin-cdn.com/media/2022/20221020_20220729_bdc347_cur_fd_lflt_correspondent_bank_a4_02_cur.pdf (last visited Jan. 16, 2023).

[28] *History*, Banco di Caribe, https://sintmaarten.bancodicaribe.com/about-us/history (last visited Jan. 9, 2023) ("In June 2022 the United Group became the new owner of the bank.")

[29] *Banco di Caribe Committed to Further Growth as Part of United Group Holdings*, ENNIA (Sept. 17, 2021), https://www.ennia.com/en/about-ennia/news/2021/banco-di-caribe/.

misrepresented the scope of the sale, touting the sale as including "all banking activities of Banco di Caribe in Curaçao, Aruba, Bonaire and Sint Maarten" and omitting that the operations in Aruba would need to be immediately resold due to the aforementioned concerns by Aruba's banking authority as to United's unsuitability as an owner.

114.    Upon information and belief, Central Bank through Jardim, Kleist, and Grimm, in their official capacities, with the active assistance of DNB, orchestrated the sale of Banco di Caribe to Elias for purposes of political and private gain and due to Jardim's close personal connections with Elias.  The sale was completed despite Elias' unsuitability as a purchaser and there being no urgency or need to sell Banco di Caribe at all.  EC Holding's shareholders were not given the opportunity to vote on or otherwise approve the sale. Central Bank, through Jardim, Kleist, and Grimm, proceeded with this ill-timed sale despite warnings from Ennia shareholders that "the unlawful sale of [Banco di Caribe], having nothing to do with the Insurance Act, will represent expropriation in clear violation of the provisions of The Most Favored Nations Clause of the U.S.-Netherlands Treaties."[30]

115.    Upon information and belief, the sale of Banco di Caribe, which permanently dispossessed Plaintiff of her property interest over that asset, was for less than book (and significantly less than fair market) value.  United, the sole bidder, paid just 120 million Antillean Guilders for the bank despite the fact that its book value alone was 180 million Antillean Guilders. At the time of the sale, Banco di Caribe was not in any financial distress and there was no legitimate business reason for the sale, particularly in the midst of the COVID-19 pandemic.  Furthermore,

---

[30] *The Unlawful Sale of Banco di Caribe at this Time Will Make the Restoration of Solvency at ENNIA Caribe Leven Permanently Imposs* [*sic*], Curacao Chronicle (Mar. 18, 2022), https://www.curacaochronicle.com/post/main/the-unlawful-sale-of-banco-di-caribe-at-this-time-will-make-the-restoration-of-solvency-at-ennia-caribe-leven-permanently-imposs/.

Central Bank has never disclosed the proceeds of the sale or explained how they were used for the benefit of the Ennia Caribe Leven or otherwise.  Given the unreliable financial statements for that Insurance Asset in the eyes of its auditor, EY, it is no wonder Central Bank wants to hide from public view that all three Insurance Assets are demonstrably solvent and flush with cash.  If Central Bank did so, it would be forced to return the Seized Companies to the US Shareholders and it could not complete Defendant's scheme to rob Plaintiff of her remaining interests.

116.    Indeed, Central Bank, acting in concert with the government of Sint Maarten, is now embarking on a bold plan to take PIBV group's most valuable asset, SunResorts and its Mullet Bay property—described as the "Pearl of the Caribbean"—and either sell it or use it for the governments' commercial gain in the name of creating jobs and enhancing Sint Maarten's local economy.

117.    According to a press report, dated December 21, 2021, Central Bank President Richard Doornbosch admitted before Members of Parliament of Curaçao that with respect to Mullet Bay "all options are on the table to basically make sure that policyholders get a return on their investments."  Notably, this statement was made months *after* the financial health of the Insurance Assets was already known and publicly declared.  These "options" outlined by Doornbosch include selling Mullet Bay to an external project developer.  That same news report unabashedly confirms that the government of Sint Maarten wants to take Mullet Bay for its own benefit.  A member of the Parliament of Curaçao has expressly called for the government of Sint Maarten to "take over the property and have it developed" and urged that the Sint Maarten government "take that Mullet Bay property for ourselves, once and for all and develop it."[31]

---

[31]    *Mullet Bay Needs to Be Developed to Pay ENNIA Policyholders, Says CBCS*, THE DAILY HERALD (Dec. 1, 2021), https://www.thedailyherald.sx/islands/mullet-bay-needs-to-be-developed-to-pay-ennia-policyholders-says-cbcs; *see also Just Call,* STMAARTENNEWS.COM

118.     No doubt that member of the Parliament of Curaçao was referring to the ongoing initiative of the Parliament of Sint Maarten aimed at "Giving Mullet Bay Back to the People." Giving Mullet Bay "back to the People", of course, would be the final and definitive step in taking that property from its rightful owners, including Dr. Ansary, just as Curaçao did with Banco di Caribe.    This parliamentary commission was established by the Sint Maarten Parliament in December 2019 and chaired by Member of Parliament ("MP") Rolando Brison to "obtain insight into the ownership of the Mullet Bay area and the current volatile (legal) position that exists between the owner, Government and the citizens. Furthermore this parliamentary inquiry serves to assess the need for Parliament and Government to intervene in every feasible way possible to protect one of its most precious coastal and inland waterways in the national interest of the country as well as to explore possibilities how best it can be used in the interest of the people from an economic, environmental, heritage and legal perspective."[32]

119.     Central Bank's role in assisting with the plan to obtain control of Mullet Bay through its control of the Ennia Insurance Assets was praised by MP Brison.[33]   In his December 2021 address, MP Brison expressly congratulated Messrs. Doornbosch and Jardim for their role in the Emergency Regulation of Ennia and called for the expansion of the scope of the Mullet Bay inquiry.

---

(Aug. 2, 2022), https://stmaartennews.com/columns/just-call/ ("A Sandals Mullet Bay, complete with casinos and golf course, is an idea …. Mullet Bay, as the new "Pearl of the Caribbean' can provide a tremendous economic boost as an economic and job center of St. Maarten . . . .").

[32] *Committee Parliamentary Inquiry Mullet Bay*, THE PARLIAMENT OF SINT MAARTEN, http://www.sxmparliament.org/committee-parliamentary-inquiry-mullet-bay/ (last visited Jan. 9, 2023)

[33] *MP Brison on Ennia / Ansary verdict. Mullet Bay Enquiry underway!*, Facebook (Dec. 1, 2021), https://www.facebook.com/watch/?v=900487400575047.

120.    The work of the Mullet Bay commission remains shrouded in secrecy and MP Brison recently postponed a previously scheduled public meeting that was to take place on October 13, 2022 to allow for confidential sessions of the Mullet Bay commission to be conducted.[34]   This drew the ire of MP Sarah A. Wescot-Williams (who is also the former Prime Minister of Sint Maarten).  MP Wescot-William expressed frustration with the delay in the work of the commission and reminded Sint Maarten's parliament that the inquiry is called "giving bay Mullet Bay *to the people*" and added that she "looks forward to seeing how far the committee got on having that done."[35]

121.    A recent press report from October 2022 confirms that this sinister plan is now well under-way.  According to this article, HA was removed as a director of SunResorts  and "Mike Alexander and Geomaly Martes, the new [SunResorts] directors appointed by the [Central Bank], are tasked with restoring order at SunResorts *and initiating the process of selling and/or developing Mullet Bay*, with the proceeds accruing to the benefit of Ennia's policyholders."[36] (emphasis added).

122.    Despite the claims that the Mullet Bay property will be sold for "the benefit of Ennia's policyholders" there has been no showing that *any* funds are needed to satisfy obligations to policyholders, nor could there be because Ennia has not defaulted on a single obligation to its policyholders.  Instead, there is serious concern that Central Bank intends to sell the property at

---

[34] *Central Committee Meeting #1*, THE PARLIAMENT OF SINT MAARTEN (Oct. 20, 2022), https://livestream.com/sxmparliament/events/10646854/videos/233308859 (Beginning at minute 9:54)

[35] *Id.*

[36] *Court Ruling Against Ansar: Mullet Bay Belongs to Ennia*, SOUALIGA NEWSDAY (Oct. 7, 2022), https://www.soualiganewsday.com/index.php?option=com_k2&view=item&id=46128:court-ruling-against-ansary-mullet-bay-belongs-to-ennia&Itemid=518.

far below market value in response to political pressure, just as it did with Banco di Caribe, or allow Sint Maarten to simply take it.  Even though the Mullet Bay property is worth upwards of $400 million, Central Bank mysteriously procured a clearly erroneous appraisal under-valuing the property at just $50 million,[37] no doubt to support a below market value fire-sale of Mullet Bay to a politically connected purchaser (just as Central Bank did with Banco di Caribe) or wrongful expropriation by the Sint Maarten government itself.

123.    Notably, Central Bank previously put forward a similar low-ball valuation for Mullet Bay as part of a court case and then abandoned it on the eve of trial, presumably because it was indefensible.  Property of this nature is unique and large, and finding accurate comparable closed sale transactions is challenging.  What is indisputable, however, is that *Central Bank itself adopted a $400+ million valuation* when—acting on behalf of EC Investments and as a regulator—it approved the dividend of Banco di Caribe's equity stake to EC Investments in 2019.  The valuation of Banco di Caribe's equity stake in Mullet Bay *at $400+ million valuation* was presented and approved in Banco di Caribe's audited financial statements with Central Bank (Jardim and Kleist's) own blessing.

124.    Indeed, a fair valuation well in excess of $400 million for Mullet Bay is also evidenced by the *actual closed sale* in 2017 of a parcel of the land (which was not even beachfront) for the construction of two condominium towers.[38]  The Minister of Finance of Sint Maarten even credited

---

[37] *Ansary Puts Ownership Mullet Bay into Question*, STMAARTENNEWS.COM (Sept. 14, 2022) https://stmaartennews.com/business/ansary-puts-ownership-mullet-bay-into-question/.

[38]  *$65 Million '14' Towers in Mullet Bay Aims to Be Emblem for St. Maarten*, THE DAILY HERALD (Oct. 27, 2021), https://www.thedailyherald.sx/islands/65-million-14-towers-in-mullet-bay-aims-to-be-emblem-for-st-maarten.

the vision of the buyer—a renowned international developer—for how valuable Mullet Bay could become again.[39]

125.    Following the onset of the COVID-19 pandemic, however, the economic and political pressure on Curaçao and Sint Maarten caused them to take desperate measures to save their "already struggling" economies.  Central Bank decided to do its part by unlawfully holding on to the Seized Companies, long after the Insurance Assets were (or easily could have been, but for Central Bank's shell game) in full compliance with applicable regulations.  Meanwhile, despite the ruse of "protecting policyholders," there is no legitimate way to benefit Ennia's policyholders by a sale of Mullet Bay because, as mentioned, all obligations to policyholders are current and the financial health of the Insurance Assets, if it ever was at hypothetical risk, was restored after converting EC Investments in securities to cash.  Central Bank itself announced over a year ago that "the solvency of ENNIA Caribe Schade NV and ENNIA Caribe Zorg NV is up to par again" and that it was "asses[ing]" the "release of these entities from under the emergency measure" yet it has failed to take any steps to remove these entities from its control.   Since that time, the rising interest rate environment has also had an enormous positive impact on the Insurance Assets and, in particular, Ennia Caribe Leven because while liabilities stay constant, the discount rate employed to value those liabilities have dramatically increased.

126.    The unlawful takeover of PIBV's Seized Companies and subsequent misappropriation of their assets constitutes an expropriation in violation of international law as well as a violation of US common law for which Plaintiff is entitled to compensation.

---

[39]  Press Release, *Minister Lawrence Welcomes Investment, Urges Social Responsibility. Optimism Builds, Hope for New Community Project, Mullet Bay Beach Boardwalk*, THE OFFICIAL WEBSITE  GOVERNMENT  OF  SINT  MAARTEN  (Oct.  28,  2021), http://www.sintmaartengov.org/PressReleases/Pages/Minister-Lawrence-Welcomes-Investment-Urges-Social-Responsibility.-Optimism-builds-Hope-for-new-community-project-Mullet.aspx.

**FIRST CLAIM FOR RELIEF**
(Expropriation in Violation of Customary International Law)

127.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

128.    Under customary international law, a state is responsible for injury resulting from a taking by the state of the property of a national of another state that: (1) is not for a public purpose, or (2) is discriminatory, or (3) is not accompanied with just compensation.  Restatement (Third) of Foreign Relations Law § 712 (1)(c). The customary international law prohibition against unlawful expropriation has been incorporated into United States common law.  More specifically, "[f]or two centuries [the Supreme Court] ha[s] affirmed that the domestic law of the United States recognizes the law of nations[,]"[40] which can be the source of substantive rights embodied in any cause of action.

129.    Additionally (and to the extent necessary, alternatively), Congress enacted the expropriation exception to the Foreign Sovereign Immunities Act based on an understanding that courts would allow and hear causes of action involving violations of customary international law. More specifically, through the expropriation exception, Congress recognized that an uncompensated taking violates international law and understood that district courts would recognize private causes of action against foreign states for expropriation in violation of customary international law.

130.    Dr. Ansary, therefore, has a direct cause of action against Defendant under the customary international law of expropriation as incorporated into US common law.  Additionally (or alternatively), Dr. Ansary has a cause of action against Defendant under the expropriation

---

[40]    *Sosa v. Alvarez–Machain*, 542 U.S. 692, 729–30 (2004).

exception of the Foreign Sovereign Immunities Act for expropriation in violation of customary international law.

131.    Prior to the unlawful expropriation by Defendant, PIBV had full ownership and control over assets that were confiscated including EC Holding, EC Investments, Banco di Caribe and SunResorts.

132.    Dr. Ansary has ownership in and rights of control over PIBV as a result of her 15.9% ownership interest and appointment as a statutory director in PIBV.

133.    International law protects Dr. Ansary's rights of ownership and control over PIBV and its assets against expropriation, including measures that have an effective equivalent to a direct expropriation, such as taking over an entities' businesses, assets and operations, thus indirectly expropriating ownership and control of the shareholder's ownership rights.  Here, Defendant has taken over the entirety of PIBV's business assets.  PIBV no longer possesses any right attendant to ownership of its property or operations, rendering Dr. Ansary's shares in PIBV useless and the equivalent of an empty shell.

134.    The PIBV assets were not seized for a public purpose, but to operate them for commercial purposes for the benefit of private individuals and private economic interests.  There has been (and continues to be) no legitimate, non-arbitrary reason to continue to hold, operate, and liquidate the assets.

135.    Defendant's taking of the assets also was discriminatory.

136.    Defendant has not paid any compensation to Dr. Ansary for the unlawful expropriation of the value of her ownership interest and rights in PIBV, let alone prompt, adequate and effective compensation.  Indeed, assets such as Banco di Caribe have been liquidated at far less than its fair value.  Had Banco di Caribe not been sold, PIBV and its shareholders would still have ownership

of that valuable asset.  And had Central Bank sold Banco di Caribe at fair value, PIBV would have realized more from the sale.

137.    Efforts to outright expropriate or sell SunResorts' most valuable asset at a fire sale price are now underway.  Central Bank has obtained an artificially low property appraisal for Mullet Bay and there is indication that it will now bow to political pressure to sell the property for less than fair value for private profit and political gain.

138.    Continued inclusion of PIBV's assets and property, including EC Holding and EC Investments in the Emergency Regulation, is pretextual and a sham to misuse PIBV assets and property including EC Investments' funds, and to dispose of EC Investments' assets. Defendant has permanently expropriated Dr. Ansary's ownership rights in PIBV by thus taking over its entire business, all of PIBV's valuable assets, looting them for private gain and leaving Dr. Ansary's proprietary interest in PIBV illusory.

139.    Central Bank has continued to entirely control and profit from PIBV's property and assets in a manner which has destroyed Dr. Ansary's lawful rights of ownership.

140.    Defendant's acts of direct and indirect expropriation are in violation of customary international law which is enforceable in the United States.

141.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

## SECOND CLAIM FOR RELIEF
### (Unfair and Inequitable Treatment in Violation of Treaty Rights)

142.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

143.    The Dutch-American Friendship Treaty is self-executing, it operates of itself without the aid of any legislative provision, and its text is the supreme law of the land, on par with that of a statute.

144.     The Dutch-American Friendship Treaty affords "Nationals and companies of either Party . . . national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."  (Article V(1)).

145.     Under the Dutch-American Friendship Treaty, therefore, Dr. Ansary can bring suit to vindicate her treaty rights in the courts of the United States.

146.     Additionally, under applicable law, the Dutch-American Friendship Treaty has specific force of law and creates a private cause of action in favor of Dr. Ansary, which Dr. Ansary can assert before the courts of the United States.

147.     Article I(1) of the Dutch-American Friendship Treaty provides

> Each Party shall at all times accord fair and equitable treatment to the nationals and companies of the other Party, and to their property, enterprises and other interests.

148.     Fair and equitable treatment requires that states safeguard investors' legitimate expectations and provide them with a stable and predictable investment framework; refrain from unreasonable, arbitrary, and discriminatory measures; refrain from harassment, coercion, and abusive treatment; act in good faith; and act transparently with due process.  Here, under the guise of quickly "restructuring" PIBV, Central Bank took control of PIBV's assets, has held on the assets for years and sold off others to local cronies at fire sale prices.  Central Bank violated Dr. Ansary's legitimate expectation that her investment would be held and operated free from interference from government regulations without appropriate public policy objectives.  Moreover, Central Bank frustrated Dr. Ansary's legitimate expectations by reneging on its written assurances that it would give EC Investments sufficient time to come into regulatory compliance with new laws when it instead seized EC Investments' assets before this time expired.  By cloaking the Emergency

Regulation in secrecy, Central Bank also arbitrarily and non-transparently retained and monetized Dr. Ansary's assets in an attempt to line its own pockets and those of its cronies.

149.    Defendant's conduct breached Article I(1) of the Dutch-American Friendship Treaty as well as customary international law.

150.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

### THIRD CLAIM FOR RELIEF
(Failure to Provide Full Protection and Security in Violation of Treaty Rights)

151.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

152.    The Dutch-American Friendship Treaty is self-executing, it operates of itself without the aid of any legislative provision, and its text is the supreme law of the land, on par with that of a statute.

153.    The Dutch-American Friendship Treaty affords "Nationals and companies of either Party . . . national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."  (Article V(1)).

154.    Under the Dutch-American Friendship Treaty, therefore, Dr. Ansary can bring suit to vindicate her treaty rights in the courts of the United States.

155.    Additionally, under the laws of the Netherlands the Dutch-American Friendship Treaty has specific force of law and creates a private cause of action in favor of Dr. Ansary, which Dr. Ansary can assert before the courts of the United States.

156.    Article VI(1) of the Dutch-American Friendship Treaty provides:

> Property of nationals and companies of either Party shall receive the most constant protection and security within the territories of the other Party.

157.    This provision requires that the host state provide physical and legal protection to investments, in part, through a stable legal environment free from political intervention.  Central Bank breached its obligation to Dr. Ansary under Article VI(1) of the Dutch-American Friendship Treaty and international law by seizing PIBV's assets, retaining them, monetizing and attempting to monetize them for the benefit of private individuals, refusing to make required financial disclosures about them, and refusing to return them to their rightful owner.

158.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

### FOURTH CLAIM FOR RELIEF
(Unreasonable and Discriminatory Measures in Violation of Treaty Rights)

159.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

160.    The Dutch-American Friendship Treaty is self-executing, it operates of itself without the aid of any legislative provision, and its text is the supreme law of the land, on par with that of a statute.

161.    The Dutch-American Friendship Treaty affords "Nationals and companies of either Party . . . national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."  (Article V(1)).

162.    Under the Dutch-American Friendship Treaty, therefore, Dr. Ansary can bring suit to vindicate her treaty rights in the courts of the United States.

163.   Additionally, under applicable law, the Dutch-American Friendship Treaty has specific force of law and creates a private cause of action in favor of Dr. Ansary, which Dr. Ansary can assert before the courts of the United States.

164.   Article VI(3) of the Dutch-American Friendship Treaty provides

> Neither Party shall take unreasonable or discriminatory measures that would impair the rights or interests within its territories of nationals and companies of the other Party, whether in their capital, or in their enterprises and the property thereof, or in the skills, arts or technology which they have supplied.

165.   Abrupt seizure and assumption of control of Ennia Group entities, maintaining that control when no conceivable public interest could be served and without any effort or intent to return the seized companies and assets to their rightful owners, and monetizing those assets for financial gain is *prima facie* unreasonable, arbitrary and a violation of Article VI(3) of the Dutch-American Friendship Treaty and international law.

166.   By reason of the foregoing, Defendant is are liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

## FIFTH CLAIM FOR RELIEF
### (Expropriation in Violation of Treaty Rights)

167.   Dr. Ansary repeats and realleges the allegations above as if set forth herein.

168.   The Dutch-American Friendship Treaty is self-executing, it operates of itself without the aid of any legislative provision, and its text is the supreme law of the land, on par with that of a statute.

169.   The Dutch-American Friendship Treaty affords "Nationals and companies of either Party . . . national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."  (Article V(1)).

170.     Under the Dutch-American Friendship Treaty, therefore, Dr. Ansary can bring suit to vindicate her treaty rights in the courts of the United States.

171.     Additionally, under applicable law, the Dutch-American Friendship Treaty has specific force of law and creates a private cause of action in favor of Dr. Ansary, which Dr. Ansary can assert before the courts of the United States.

172.     Article VI(4) of the Dutch-American Friendship Treaty provides:

> Property of nationals and companies of either Party shall not be taken within the territories of the other Party except for a public interest, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

173.     Prior to the unlawful expropriation by Central Bank, PIBV had full ownership over assets that were confiscated including EC Holding, EC Investments, Banco di Caribe and SunResorts.

174.     Dr. Ansary has ownership in and rights of control over PIBV as a result of her 15.9% ownership interest and appointment as a statutory director in PIBV.

175.     International law protects Dr. Ansary's rights of ownership and control over PIBV and its assets against expropriation, including measures that have an effect equivalent to a direct expropriation, such as taking over an entities' businesses, assets and operations, thus indirectly expropriating ownership and control of the shareholder's ownership rights.  Here, Defendant has taken over the entirety of PIBV's business.  PIBV no longer possesses any significant tangible property or operations, rendering Dr. Ansary's shares in PIBV useless.

176.     The PIBV assets were not seized for a public purpose, but to operate them for commercial purposes for the benefit of private individuals and interests.  There has been (and

continues to be) no legitimate, non-arbitrary reason to continue to hold, operate, and liquidate the Assets.

177.    Defendant's taking of the assets also was discriminatory.

178.    Defendant has not paid any compensation to Dr. Ansary for the unlawful expropriation of her ownership interest and rights in PIBV, let alone prompt, adequate and effective compensation.  Indeed, assets such as Banco di Caribe have been liquidated at far less than its fair value. Had Banco di Caribe not been sold, PIBV and its shareholders would still have ownership of that valuable asset.  And had Central Bank sold it at fair value, PIBV would have realized more from the sale.

179.    Efforts to outright expropriate or sell SunResorts' most valuable asset at a fire sale price are now underway.  Central Bank has obtained an artificially low property appraisal for Mullet Bay and there is indication that it will now bow to political pressure to sell the property for less than fair value for private profit and political gain.

180.    Continued inclusion of PIBV's assets and property, including EC Holding and EC Investments in the Emergency Regulation, was pretextual and a sham to misuse PIBV assets and property including EC Investments' funds, and to dispose of EC Investments' assets. Defendant has permanently expropriated Dr. Ansary's ownership rights in PIBV by thus taking over the entire business, all of PIBV's valuable assets, looting them for private gain and leaving Dr. Ansary's proprietary interest in PIBV illusory.

181.    Central Bank has continued to entirely control and profit from PIBV's property and assets in a manner which has destroyed Dr. Ansary's lawful rights of ownership.

182.    Defendant's acts of expropriation are in violation of Article VI(4) of the Dutch-American Friendship Treaty and international law.

183.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

## SIXTH CLAIM FOR RELIEF

(Breach of National and Most-Favored-Nation Treatment in Violation of Treaty Rights)

184.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

185.    The Dutch-American Friendship Treaty is self-executing, it operates of itself without the aid of any legislative provision, and its text is the supreme law of the land, on par with that of a statute.

186.    The Dutch-American Friendship Treaty affords "Nationals and companies of either Party" . . . "national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights."  (Article V(1)).

187.    Under the Dutch-American Friendship Treaty, therefore, Dr. Ansary can bring suit to vindicate her treaty rights in the courts of the United States.

188.    Additionally, under applicable law, the Dutch-American Friendship Treaty has specific force of law and creates a private cause of action in favor of Dr. Ansary, which Dr. Ansary can assert before the courts of the United States.

189.    Article VI(5) of the Dutch-American Friendship Treaty provides

> Nationals and companies of either Party shall in no case be accorded, within the territories of the other Party, less than national treatment and most-favored-nation treatment with respect to the matters set forth in paragraphs 2 and 4 of the present Article.

190.    Under the Dutch-American Friendship Treaty and international law, this provision is intended to prevent discrimination on the basis of nationality between similarly situated domestic investors or investments and investors or investments of the other Party and does not require a

showing of discriminatory intent.  On information and belief, PIBV and its subsidiaries are the *only* companies in the industry who have suffered this discriminatory and harmful treatment, and no similarly situated domestic companies have been subject to seizure of their companies or assets, or deprivation to their investors of ownership interests in the company.  This inequitable treatment suffered by Dr. Ansary is a national treatment violation and a breach of the Dutch-American Friendship Treaty.

191.    Additionally, Curaçao, Sint Maarten, and the Netherlands are parties to numerous other investment treaties which prohibit unjustifiable, unreasonable, or discriminatory measures, expropriation, and the failure to provide full protection and security.  This provision also requires Defendant to offer Claimants the more favorable protections of other treaties.  As Central Bank has seized control of Dr. Ansary's assets, effectively depriving her of her ownership interest in PIBV, it has also brazenly failed to provide Dr. Ansary with treatment equivalent to that accorded to its other treaty partners.

192.    Defendant's conduct therefore violated Article VI(5) of the Dutch-American Friendship Treaty and international law.

193.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

### SEVENTH CLAIM FOR RELIEF
(Common Law Conversion)

194.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

195.    Dr. Ansary has an absolute and unconditional property right in PIBV by and as a result of her 15.9% ownership interest.

196.    Prior to the application of the Emergency Regulation, PIBV, with operations and assets across Curaçao and St, Maarten was a thriving $700 million business.

197.    Defendant, as described herein, has unlawfully and without authorization assumed control, dominion and ownership over PIBV's business assets, and, with it, Dr. Ansary's ownership interest, converting this interest and depriving her of its benefit.

198.    Defendant has continued to control and profit from its expropriation in a manner adverse and inconsistent with Dr. Ansary's lawful rights of ownership.

199.    By reason of the foregoing, Defendant is liable to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

**EIGHTH CLAIM FOR RELIEF**
(Unjust Enrichment)

200.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

201.    Dr. Ansary has an absolute and unconditional property right in PIBV by and as a result of her 15.9% ownership interest.

202.    Prior to the application of the Emergency Regulation, PIBV, with operations and assets across Curaçao and Sint Maarten was a thriving $700 million business.

203.    Defendant, as described herein, has unlawfully and without authorization assumed control, dominion and ownership over PIBV's business, and, with it, Dr. Ansary's ownership interest, depriving her of the benefit.

204.    Defendant has done so to profit themselves and continue to control and profit from their expropriation in a manner adverse and inconsistent with Dr. Ansary's lawful rights of ownership. Defendant has thus been unjustly enriched at Dr. Ansary's expense.

205.    Equity and good conscience require Defendant to make restitution to Dr. Ansary in an amount to be determined at trial, but in no event less than US $110 million.

## NINTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

206.    Dr. Ansary repeats and realleges the allegations above as if set forth herein.

207.    After the implementation of the Emergency Regulation, Central Bank took exclusive control of PIBV's seized assets and exercised all powers of the board of directors and supervisory board or representatives.

208.    Jose Jardim, Kelvin Kleist, and Elisabeth Grimm, acting in their official capacity on behalf of Central Bank, were appointed as managers and/or advisors to PIBV's seized assets, including EC Holding and its subsidiaries, including EC Investments, and took up the day-to-day management of the affairs of all assets and companies subject to the Emergency Regulation for and on behalf of Defendant.

209.    Central Bank owed traditional fiduciary duties of loyalty and care to the shareholders of PIBV, including Dr. Ansary.

210.    Central Bank, acting through Jardim, Kleist, and Grimm, caused the sale of Banco di Caribe, a valuable asset of PIBV and its shareholders, including Dr. Ansary, at a below-market value, for no legitimate business purpose and for personal and political gain.

211.    Plaintiff has not received any fair compensation for the sale of Banco di Caribe.

212.    Efforts to outright expropriate or sell SunResorts' most valuable asset at a fire sale price are now underway.  Central Bank has obtained an artificially low property appraisal for Mullet Bay and there is indication that it will bow to political pressure to sell the property for less than fair value to achieve the interests of the Government of Sint Maarten. As a result of Defendant's actions, Defendant is liable to Plaintiff in an amount to be determined at trial, but in no event less than US $110 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor as follows:

**A.** On the First Claim for Relief, damages to be determined at trial, but in no case less than $110 million.

**B.** On the Second Claim for Relief, damages to be determined at trial, but in no case less than $110 million.

**C.** On the Third Claim for Relief, damages to be determined at trial, but in no case less than $110 million.

**D.** On the Fourth Claim for Relief, damages to be determined at trial, but in no case less than $110 million.

**E.** On the Fifth Claim for Relief, damages to be determined at trial, but in no case less than $110 million.

**F.** On the Sixth Claim for Relief, damages to be determined at trial, but in no case less than US $110 million.

**G.** On the Seventh Claim for Relief, damages to be determined at trial, but in no case less than US $110 million.

**H.** On the Eighth Claim for Relief, damages to be determined at trial, but in no case less than US $110 million.

**I.** On the Ninth Claim for Relief, damages to be determined at trial, but in no case less than US $110 million.

**J.** Interests, costs and disbursements, including reasonable attorneys' fees and disbursements incurred in this action; and

**K.** Such other and further relief as the Court deems appropriate.


DATED:  January 17, 2023                 Respectfully submitted,

                                         QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP

                                         By:
                                         _____
                                         Dennis H. Hranitzky, D.C. Bar No. NY0117
                                         2755 E. Cottonwood Parkway, Suite 430
                                         Salt Lake City, Utah 84121
                                         Tel: 801-515-7300
                                         Fax: 801-515-7400

                                         Susheel Kirpalani (*Pro hac to be filed*)
                                         Debra O'Gorman, D.C. Bar No. NY0499
                                         51 Madison Avenue, 22nd Floor
                                         New York, NY 10010
                                         Tel: 212-849-7000
                                         Fax: 212-849-7100

                                         Daniel Salinas-Serrano (*Pro hac to be filed*)
                                         1300 I Street NW, Suite 900
                                         Washington, D.C. 20005
                                         Tel: 202-538-8000
                                         Fax: 202-538-8100

                                         *Counsel for Plaintiff Nina Ansary*