UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NINA ANSARY,<br><br>        Plaintiff,<br><br>        v.<br><br>CENTRAL BANK OF CURACAO AND SINT MAARTEN,<br><br>        Defendant. | Civil Action No. 23-cv-134 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Dr. Nina Ansary sued Curaçao's banking regulator, Central Bank of Curaçao and Sint Marteen ("Central Bank"), alleging that it violated contract, tort, and international law by mismanaging insurance subsidiaries of a Curaçao company in which she holds stock, following a regulatory takeover. Defendant moved to dismiss, alleging preclusion, lack of subject matter jurisdiction, lack of personal jurisdiction, and forum non conveniens. Mot. to Dismiss, ECF No. 23 ("Motion"). Having reviewed the record and the briefs, the court will GRANT Defendant's Motion, finding that Defendant is entitled to foreign sovereign immunity.

I.    BACKGROUND

**A.    Factual Background**

Plaintiff holds a 15.9% stake in Parman International B.V. ("Parman"). Am. Compl., ECF No. 22 ¶ 2. Parman owns a consortium of insurance assets known as the Ennia Group ("Ennia"), along with beachfront real estate and financial services entities. *Id.* ¶¶ 36–38. In 2015, Central Bank adopted new insurance regulations that caused Ennia to be out of compliance with regulatory requirements. *Id.* ¶ 45. Central Bank initially gave Ennia until 2019 to come

into compliance, but changed its mind in 2018 after a major shareholder of one of the insurance assets withdrew $100 million from that asset and transferred it to his own privately held company.  *Id.* ¶¶ 46–49.

Central Bank then seized Ennia pursuant to a Curaçao law that allows it to petition a Curaçao court for control of any "insurance business" that is "in serious financial distress for the purpose of restructuring it."  *Id.* ¶¶ 2, 32, 35, 50–54.  Plaintiff alleges that Central Bank seized Ennia through a "pretextual 'restructuring'" despite a complete lack of evidence that they were insolvent or at risk of defaulting on any of its obligations and despite Central Bank's assurance that the insurance assets had until 2019 to come into regulatory compliance.  *Id.* ¶¶ 3, 46.  Nevertheless, Central Bank "publicly assured" its shareholders that its seizure would be "short-lived" and "limited to an internal re-ordering of the ownership of the assets within [its] insurance businesses."  *Id.* ¶¶ 3, 60.  In furtherance of the "restructuring," Central Bank caused Ennia to petition for approval in a U.S. bankruptcy court to utilize $280 million of Parman's liquid investments in New York.  *Id.* ¶¶ 4, 77–80.

Plaintiff alleges that Central Bank still refuses to "let go of its grip on" Parman's assets, even though Parman is financially stable and in compliance with regulations; Central Bank did not use the $280 million to complete the restructuring; and Central Bank has not filed required financial disclosures.  *Id.* ¶¶ 4, 7–8, 82, 89–92, 102–05.  Moreover, Plaintiff claims that Central Bank exercised its authority over Ennia to control Parman's non-regulated assets, and "embarked on a scheme to plunder the [Parman] businesses," which included selling its profitable financial services entities and attempting to exploit its real estate entities.  *Id.* ¶¶ 4–5, 57, 61, 106–27.  In response, Central Bank's Supervisory Board has launched an internal investigation and "fired one of the regulators at the center of the pretextual 'restructuring.'"  *Id.* ¶ 9.  Plaintiff alleges that

Central Bank's actions have rendered her shares in Parman "useless," as Parman is now "the equivalent of an empty shell." *Id.* ¶ 10; *accord id.* ¶ 31; *see* Compl., ECF No. 1.

**B.      Related Litigation**

There have been several related suits filed in Curaçao and the United States. First, in 2019 and 2021, Parman instituted proceedings in Curaçao seeking to terminate Central Bank's seizure of Ennia. Am. Compl. ¶¶ 71–72. In both cases, the court "refused to place any timeframe on Central Bank's seizure of the insurance assets or define which assets could be liquidated." *Id.* ¶ 71. According to Plaintiff, these decisions "were not 'final and binding' under the law of Curaçao and the Netherlands, and therefore [are] without preclusive effect in any other proceeding." *Id.* ¶ 72. Plaintiff did not participate in either proceeding. *Id.*

Second, Central Bank sued the directors of Parman's companies—including Plaintiff—in Curaçao "to punish and deter [them] from interfering with its plans to expropriate [Parman's] assets." *Id.* ¶ 73. Plaintiff claims that the court "issued a deeply flawed judgment" after a sham trial, holding that the directors were liable for "hundreds of millions of dollars in compensation" to Parman's companies. *Id.* ¶ 74. Plaintiff appealed that judgment, *id.* ¶ 75, and the appellate court preliminarily affirmed in part and reversed in part, *see* Status Report, ECF No. 26 at 1–2. The appellate court reversed as to Plaintiff, concluding that "[n]o serious blame can be put on [Plaintiff] for the improper performance of her duties," and she was not "negligent." Excerpt of Appellate Decision, ECF No. 26-2 at 4. The court did note, however, that Plaintiff "may owe certain amounts" to one of the insurance assets for "unjust enrichment." *Id.*

Finally, Central Bank sought to enforce the Curaçao court's judgment by causing Ennia to initiate lawsuits in the Central District of California and the Southern District of Texas. Am. Compl. ¶¶ 84–85; *see Altena v. Ansary*, No. 21-cv-10013 (C.D. Cal.); *Altena v. Ansary*, No. 21-

cv-4159 (S.D. Tex.). The California action named Plaintiff as a defendant, Am. Compl. ¶ 87, but was voluntarily dismissed without prejudice following the Curaçao appellate decision, *see* ECF Nos. 79, 80, *Altena v. Ansary*, No. 21-cv-10013 (C.D. Cal.). The Texas action is currently stayed with the consent of the parties pending a final decision from the Curaçao appellate court. *See* Tr. of Proceedings, ECF No. 102 at 7:12–24, *Altena v. Ansary*, No. 21-cv-4159 (S.D. Tex.).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a defendant to move to dismiss a claim for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Foreign sovereign immunity is an issue of subject matter jurisdiction. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 442 (D.C. Cir. 1990) ("District courts in a civil action against a foreign state, or the agency or instrumentality of a foreign state, lack subject matter jurisdiction unless one of the exceptions to immunity applies."). To survive a Rule 12(b)(1) motion, the plaintiff must establish that the court has subject matter jurisdiction as to each claim, not just one. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In assessing a motion to dismiss, the court must "accept all of the factual allegations in the complaint as true," *Jerome Stevens Pharms. Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005) (citation omitted), and construe the complaint "in the light most favorable to" the non-moving party, *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011). That said, because the court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the "factual allegations in the complaint . . . will bear closer scrutiny [than those allegations would] in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quotation marks and citation omitted). Moreover, the court need not accept "legal conclusions

that are cast as factual allegations." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (citation omitted).

### III.     ANALYSIS

The Foreign Sovereign Immunities Act ("FSIA") "affords the 'sole basis for obtaining jurisdiction over a foreign state' in United States courts." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022) (citation omitted).  It provides: "Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States."  28 U.S.C. § 1604.  "In order to preserve the full scope of that immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible."  *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (citation omitted).  "The FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies," at which point "the sovereign bears the ultimate burden of persuasion to show the exception does not apply."  *Wye Oak Tech., Inc.*, 21 F.4th at 696 (citation omitted).

Plaintiff concedes that Defendant qualifies as a "foreign state" entitled to foreign sovereign immunity.  Am. Compl. ¶ 13; Mem. in Opp'n to Mot. to Dismiss, ECF No. 24 at 24–25 ("Opp'n"); *see* 28 U.S.C. § 1603(a)–(b) (explaining that a foreign state includes its agencies and instrumentalities).  But she contends that several exceptions to foreign sovereign immunity apply here: the implicit waiver exception, the commercial activities exceptions, and the expropriation exceptions.  *See* Am. Compl. ¶¶ 15–21.  Because Defendant "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," the court will "take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked."  *See Phx. Consulting Inc.*, 216 F.3d at 40.

A.     **Implicit Waiver Exception**

*i.     Legal framework*

A foreign state is not immune from suit if it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). The statute "does not define" implicit waiver, *Wye Oak Tech., Inc.*, 24 F.4th at 691, but the D.C. Circuit construes this provision "narrowly," *Khockinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021) (citation omitted). Finding implicit waiver requires "strong evidence" "that the foreign state . . . *intended* to waive its sovereign immunity." *Id.* (citations omitted; emphasis in original). Consequently, the D.C. Circuit has found implicit waiver "in only three circumstances: (i) the state's executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (ii) the state's filing a responsive pleading without asserting sovereign immunity; or (iii) the state's agreeing to submit a dispute to arbitration in the United States." *Id.* at 8–9 (citation and internal quotation marks omitted). Although these three circumstances are "not necessarily exhaustive," *Human v. Czech Republic Ministry of Health*, 824 F.3d 131, 140 (D.C. Cir. 2016) (Sentelle, S.J., dissenting), "courts have been reluctant to stray beyond these examples when considering claims that a nation has implicit waived its defense of sovereign immunity," *Khockinsky*, 1 F.4th at 9 (citation omitted).

The D.C. Circuit has not directly addressed whether a foreign state's actions in related proceedings can implicitly waive sovereign immunity. *But cf. Broidy v. Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 996–97 (D.C. Cir. 2023) (concluding that the waiver exception does not apply when a foreign sovereign intervenes in an action because "mere intervention would not 'standing alone, fit in the selective company of implied waiver cases'" (citation omitted)). The Second and Ninth Circuits, however, have held that a foreign state may implicitly waive

sovereign immunity by initiating a related proceeding in a U.S. court if the related proceeding contains a "direct connection" to the claims in the instant action. *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 202 (2d Cir. 1999); *see Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003) ("To support a finding of implied waiver . . . there must exist a direct connection between the sovereign's activities in our courts and the plaintiff's claims for relief." (citation omitted)). *Cf. Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 721–22 (9th Cir. 1992) ("[T]he essential inquiry . . . is whether a sovereign contemplated the involvement of United States courts in the affair in issue.").

These courts construe this standard narrowly. For example, in *Cabiri*, 165 F.3d at 195–96, plaintiff Cabiri, a trade representative of Ghana to the United States, sued Ghana, claiming he was detained and tortured in Ghana for approximately a year. During that time, his family—also plaintiffs to the suit—lived in a New York home that Ghana provided him during his employment. *Id.* After Cabiri was released from detention, Ghana brought an eviction proceeding in New York, seeking to remove him and his family from the New York home. *Id.* at 196. The Second Circuit held that "Ghana's commencement of proceedings in New York to evict plaintiffs" was not an implied waiver of its sovereign immunity in the wrongful detention and torture lawsuit, "even if occupancy is arguably the contractual perquisite of an employment relationship frustrated by Ghana's wrongful detention and torture of its employee in Ghana." *Id.* at 202. Plaintiffs argued that the eviction proceeding was "a step in Ghana's scheme to persecute and torture" them, but the court noted that eviction would have resulted in them leaving the home, not returning to Ghana where Cabiri was detained and tortured, and that the eviction proceeding postdated those events. *Id.* Similarly, in *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991), the Second Circuit explained that, even if it recognized that related

suits could lead to waivers of sovereign immunity, there was no implied waiver in that case because the actions "involve[d] a different set of rights and obligations" between the parties, even though they arose from the same promissory notes.

    *ii.*    *Application*

Plaintiff has not met her burden to show the implied waiver exception applies here. None of the three key examples of implied waiver are present. Plaintiff does not assert that there is a contractual choice of law clause between Plaintiff and Defendant selecting the laws of the United States; that Defendant filed a responsive pleading in this suit without asserting sovereign immunity; or that there is any arbitration agreement. *See Khockinsky*, 1 F.4th at 8–9.

Plaintiff argues—for the first time, in her opposition—that "Central Bank's actions qualify under all three waiver examples." Opp'n at 26. But in her Complaint, Plaintiff alleged only that the implied waiver exception applied because of the related proceedings in U.S. courts. Am. Compl. ¶ 15. And "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020). Moreover, Plaintiff only makes arguments regarding two of the three waiver examples—choice of law and failure to assert sovereign immunity—both of which fail on the merits. *See* Opp'n at 26–27. Plaintiff again relies on the related proceedings, arguing that Defendant chose U.S. law when Ennia initiated those proceedings and did not assert sovereign immunity in those proceedings. Not only has the D.C. Circuit never applied these exceptions in similar circumstances, but, as explained *infra* (at 9–10), even if Ennia's lawsuits can be imputed to Defendant, the related proceedings did not bear a "direct connection" to this suit, *see Cabiri*, 165 F.3d at 202; *Blaxland*, 323 F.3d at 1207.

Nor did the related actions implicitly waive Defendant's sovereign immunity. At the outset, it is not clear that the foreign representative who initiated these suits was capable of waiving Defendant's sovereign immunity. For purposes of the FSIA, a "foreign state" capable of waiving immunity includes agencies or instrumentalities. 28 U.S.C. § 1603(a). But to be an "agency or instrumentality," an entity must be "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b)(2). The foreign representative brought these suits on behalf of Ennia—Parman's insurance entities presently controlled by Defendant—not Defendant itself. *See, e.g.*, Compl., ECF No. 1 ¶ 7, *Altena v. Ansary*, No. 21-cv-10013 (C.D. Cal.) ("Sabine Altena is an individual . . . duly appointed Foreign Representative, with authority to bring suit in the United States on behalf of ENNIA."). And Defendant itself "was not a party to *any* of the U.S. actions." Reply in Supp. of Mot. to Dismiss, ECF No. 25 at 10 ("Reply"). Thus, although Ennia was arguably an agent of Defendant's, it has a much less direct relationship to Curaçao itself. For example, in *Foremost-McKesson, Inc.*, 905 F.2d at 448, the D.C. Circuit remanded to the district court to consider whether Pak Dairy was an agent of Iran, concluding that "the showing required to support a claim of attribution [was] far from straightforward" because "Iran's alleged control over Pak Dairy was exercised through entities on Pak Dairy's Board, which were in turn allegedly controlled by Iran." Consequently, it was not clear that the foreign representative bore a close enough relationship to the foreign state to waive its immunity. *See id.*

Even if Ennia's actions can be imputed to Defendant, however, the related suits do not waive Defendant's sovereign immunity because they do not bear a "direct connection" to this case. In the bankruptcy proceeding Plaintiff cites, Ennia sought approval to utilize $280 million

Page **9** of **20**

of Parman's liquid investments in New York in furtherance of its restructuring. Am. Compl. ¶¶ 4, 77–80. As in *Cabiri*, 165 F.3d at 202, Plaintiff alleges that the bankruptcy proceeding was "a step in [Defendant's] scheme." But that connection alone is insufficient to waive Defendant's sovereign immunity, and there are far more differences than similarities between the suits. *See id.* In the Texas and California actions, Ennia sought to collect against a nonparty individual and Plaintiff, respectively, pursuant to the Curaçao decision. Compl. ¶¶ 27–35, *Altena v. Ansary*, No. 21-cv-10013 (C.D. Cal.); Compl., ECF No. 1 ¶¶ 27–38, *Altena v. Ansary*, No. 21-cv-4159 (S.D. Tex.). Importantly, the parties have not, and will not, litigate the merits of the Curaçao decision in those actions. Rather, Ennia sought to collect under state laws that recognize and enforce the validity of foreign judgments. *See* Cal. Code Civ. Proc. §§ 1715(a), 1716(a); Tex. Civil Prac. & Rem. Code § 36A.007. What is more, the Curaçao decision addressed only some of the same issues Plaintiff raises in this case. *See Cabiri*, 165 F.3d at 202. In Curaçao, Central Bank sued the directors of Parman's companies—including Plaintiff—alleging they performed improperly and were liable to Parman for negligence. Am. Compl. ¶¶ 73–74. Plaintiff here does not allege that Parman's directors or shareholders acted improperly, but rather that Central Bank was the bad actor. *See id.* ¶¶ 4, 7–8, 82, 89–92, 102–05. In sum, the implied waiver exception to the FSIA does not apply in this case.

B.  **Commercial Activity Exceptions**

The commercial activity exception provides that a foreign state is not immune from suit in three circumstances: (1) if "the action is based upon a commercial activity carried on in the United States by the foreign state"; (2) if the action is based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) if the action is based "upon an act outside the territory of the United States in connection with a

commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Each clause requires that the foreign state be engaged in commercial activity, rather than regulatory activity, and that the suit is "based upon" that activity. *See id.* Once those elements are established, the court analyzes, under each clause, whether the defendant's alleged commercial activity has the necessary nexus with the United States. *See id.*

> i.   Whether Plaintiff's suit is "based upon" "commercial activity"

The analysis "begin[s]" "by identifying the particular conduct on which the [suit's] action is 'based' for purposes of the Act." *Saudia Arabia v. Nelson*, 507 U.S. 349, 356 (1993). The FSIA does not define "based upon," but the Supreme Court has held that "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* at 357. The phrase "calls for something more than a mere connection with, or relation to, commercial activity," *id.* at 358, and the activity must establish more than "a single element of the claim," *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 34 (2015). In *Nelson*, 507 U.S. at 357, for example, the Court held that plaintiffs' suit was not "based upon" commercial activity even though they sued for personal injuries they experienced while working for defendants. Even though Defendants "recruited [plaintiff] Nelson for work at the hospital, signed an employment contract with him, and subsequently employed him"—all "arguable" commercial activities—and "those activities led to the conduct that eventually injured the Nelsons," it was the personal injury torts, "and not the arguable commercial activities that preceded their commission," that were the "basis for the Nelsons' suit." *Id.*

Once the court identifies "the gravamen of the Plaintiffs' action," it "must next determine whether it constitutes 'commercial activity.'" *Rosenkrantz v. Inter-American Dev.*

*Bank*, 35 F.4th 854, 864 (D.C. Cir. 2022).  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The Supreme Court has interpreted this definition as "restrictive," and held that "a foreign state engages in commercial activity . . . only where it acts 'in the manner of a private player within' the market."  *Nelson*, 507 U.S. at 359–60 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  "[T]he question is not whether the foreign government is acting with a profit motive," but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'"  *Weltover, Inc.*, 504 U.S. at 614 (citation omitted).

For example, in *Weltover*, *id.* at 615–17, the Court concluded that Argentina engaged in commercial activity in refinancing bonds because the bonds were "in almost all respects garden-variety debt instruments."  *Accord Janini v. Kuwait Univ.*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) (foreign state's decision to terminate an employment contract was commercial activity because "[p]rivate parties often repudiate contracts in everyday commerce").  By contrast, in *Nelson*, 507 U.S. at 361–62, the Supreme Court held that "the Saudi Government's wrongful arrest, imprisonment, and torture of Nelson" was not commercial activity because it "boil[ed] down to abuse of the power of [the] police," which is "peculiarly sovereign in nature" and "not the sort of action by which private parties can engage in commerce."  *Accord Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) ("Granting refuge to terrorist training camps is a uniquely sovereign act; it is not the sort of benefit that a commercial landlord can bestow upon a commercial tenant.").

Determining whether conduct constitutes "commercial activity" is especially complicated in cases involving state expropriation of private entities.  On one hand, the D.C. Circuit has held that a foreign state's "alleged breach of bailment agreements easily satisfie[d]" the commercial

activity requirement" even though the entity that defendant controlled was initially expropriated because the conduct the suit was "based" upon was "not the initial expropriation . . . but instead Hungary's creation and repudiation of subsequently formed bailment agreements." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 599–600 (D.C. Cir. 2013) ("*de Csepel I*"). On the other, the Court held that a foreign state's "takeover and management of [a] company" was not commercial activity because it "flow[ed] from" a state declaration and was therefore "an act that can be taken only be a sovereign," rather than a "corporate takeover." *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 889–90 (D.C. Cir. 2006). Harmonizing *de Csepel I* and *Rong*, "claims arising from the original expropriation" do not fall within the commercial activity exception, but "subsequent commercial transactions" involving the expropriated entity do. *See Garb v. Republic of Poland*, 440 F.3d 579, 587–88 (2d Cir. 2006) (creating a similar standard).

Plaintiff's suit includes nine claims against Defendant: (1) conversion of Plaintiff's ownership interest in Parman, Am. Compl. ¶¶ 130–35; (2) unjust enrichment by profiting off its control over Parman at Plaintiff's expense, *id.* ¶¶ 136–41; (3) breach of fiduciary duty by selling Parman's financial services arm "at a below-market value" and attempting to sell the real estate arm's "most valuable asset at a fire sale price," *id.* ¶¶ 142–48; (4) violating customary international law by expropriating Plaintiff's interest in Parman, *id.* ¶¶ 149–63; (5) violating the Duty-American Friendship Treaty ("Treaty") by treating Parman's investors unfairly, *id.* ¶¶ 164–70; (6) violating the Treaty by failing to protect Plaintiff's investment, *id.* ¶¶ 171–76; (7) violating the Treaty by taking unreasonable and discriminatory actions in controlling the Ennia Group, *id.* ¶¶ 177–82; (8) violating the Treaty by expropriating Plaintiff's interest in Parman, *id.* ¶¶ 183–97; and (9) violating the Treaty by failing to provide Plaintiff with equitable treatment, *id.* ¶¶ 198–205. The parties agree that the gravamen of each claim is Defendant's

alleged mismanagement of Parman's assets during its regulatory takeover of Ennia. *See* Opp'n at 31 (explaining that the "gravamen" of most of Plaintiff's claims is the sale of the financial services arm and Defendant's efforts to sell the real estate arm); *id.* at 32–33 (other causes of action are "based on" Defendant's management of Ennia); Reply at 18.

Whether this conduct is commercial activity is a close question. One could argue that, although Defendant's decisions in managing Parman, including selling Parman's financial services arm, may "seem commercial," "all of these acts flow from" the Emergency Regulation that authorized Defendant to take control of Parman—"an act that can be taken only by a sovereign." *Rong*, 452 F.3d at 889. And, just like in *Rong*, the sovereign "did not assume control over [the company] by purchasing the majority of [its] stock . . . as a private party would; instead, it . . . claimed them, as does a sovereign." *Id.* at 890; *see* Am. Compl. ¶¶ 50–54. No private party could similarly seize Parman's assets. *See Weltover, Inc.*, 504 U.S. at 614. But, at bottom, Plaintiff does not challenge Defendant's decision to expropriate Parman pursuant to the Emergency Regulation itself. Rather, Plaintiff challenges Defendant's "subsequent[]" management decisions, and the effects those decisions had on Parman's stock. *See de Csepel I*, 714 F.3d at 600. The court need not decide, however, whether Defendant's alleged conduct constituted "commercial activity," because even if it did, Plaintiff has not alleged the necessary nexus with the United States under any clause of the commercial activity exception. *Infra* at 15–17.

      ii.      *Whether Plaintiff's suit bears the necessary nexus with the United States*

Each clause of the commercial activity exception requires a different nexus with the United States. Under the first clause, the suit must be "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). Relatedly, under the second clause, the suit

must be based "upon an act performed in the United States in connection with a commercial activity" elsewhere. *Id.*

Plaintiff alleges that the case is "based upon" "several commercial activities carried on in the United States": that Defendant operates and manages Parman's assets in the United States; that Parman's assets are owned by U.S. shareholders; that Defendant liquidated investments in New York as part of the reorganization; that Defendant retained a Miami-based investment banking firm to orchestrate the sale of Parman's financial services arm; and that Defendant denied Plaintiff, a U.S. national, her ownership rights in Parman. Am. Compl. ¶ 17. She also claims that Defendant performed several overlapping acts in the United States in connection with its commercial activity abroad: Defendant arranged for Ennia to seek liquidation of the New York assets; initiated enforcement actions in the United States (the Texas and California actions); and retained an American firm "to facilitate the commercial sale of" the financial services arm. *Id.* ¶ 18. But, as Plaintiff admits, none of these allegations are the "gravamen" of her claims. *See* Opp'n at 31–33; *supra* at 13–14 (the gravamen of Plaintiff's claims is Defendant's alleged mismanagement of Parman's assets during its regulatory takeover). The closest is Plaintiff's allegation that Defendant liquidated Ennia's assets in the United States and then did not use those assets, but that allegation is alone not the basis of Plaintiff's suit. Consequently, neither the first nor second clause exempts Defendant from sovereign immunity.

Finally, under the third clause of the commercial activity exception, the suit must be based on an act that occurs elsewhere, in connection with commercial activity elsewhere, and "that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). A direct effect "need not be 'substantial' or 'foreseeable' so long as it is more than 'purely trivial' and 'it follows as an immediate consequence of the defendant's activity.'" *Princz v. Federal Republic*

*of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (citation omitted).  Applying this framework, the Court in *Weltover*, 504 U.S. at 618–19, held that Argentina's decision to reschedule the bonds' maturity dates had a direct effect in the United States because U.S. bank accounts were the place of payment for the bonds, making it the "place of performance for Argentina's ultimate contractual obligations."  By contrast, the D.C. Circuit in *Princz*, 26 F.3d at 1172, concluded that all of plaintiff's alleged effects in the United States were not "direct" because "[m]any events and actors necessarily intervened between" defendant's alleged actions "and any effect felt in the United States."  Moreover, "loss to an American individual . . . resulting from a foreign tort" is insufficient "standing alone to satisfy the direct effect requirement" because, were that not the case, "the commercial activity exception would in large part eviscerate the FSIA's provision of immunity."  *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1184 (D.C. Cir. 2013) (citation omitted).

      Plaintiff alleges that the "direct effects" felt in the United States are the property rights and financial losses for U.S. shareholders resulting from Defendant's mismanagement of Parman's assets and Ennia initiating the Texas and California actions.  Am. Compl. ¶ 19. Neither of these "effects," however, is "direct" within the meaning of the FSIA.  First, the losses felt by shareholders in the United States are insufficient to satisfy the direct effect requirement under *Bell Helicopter Textron, Inc.*, 734 F.3d at 1184.  As Defendant notes, it "merely exercised regulatory authority of Curaçao entities owned by another Curaçao corporation that happened to already have U.S. investors."  Reply at 13.  Second, the enforcement actions in the United States were not an immediate consequence of the Curaçao suit against the U.S. directors.  Rather, Ennia chose to bring those actions to assist it in collecting on the judgments.  Moreover, Plaintiff's suit

is not "based upon" the Curaçao suit. As the court has already explained, *supra* at 9–10, the Curaçao litigation does not even bear a direct connection to this suit.

Consequently, Defendant is not subject to suit in the United States under any of the commercial activity exceptions.

**C.     Expropriation Exceptions**

The final exceptions to sovereign immunity that Plaintiff invokes are the expropriation exceptions. *See* 28 U.S.C. § 1605(a)(3). These apply in two scenarios: (1) when "rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," and (2) when "rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.*

The D.C. Circuit has held that the first clause applies only to a foreign state itself and the second clause applies only to an agency or instrumentality of a foreign state. *See De Csepel v. Republic of Hungary*, 27 F.4th 736, 743 (D.C. Cir. 2022) (citation omitted) ("*De Csepel II*"). Consequently, the court must first analyze whether Defendant is the "foreign state" itself subject to the first clause or an "agency or instrumentality" of the foreign state subject to the second clause. *See id.*

To determine whether an entity is an agency or instrumentality of a foreign state or the foreign state itself, courts consider "whether its 'core functions are governmental or commercial.'" *Id.* (citation omitted). Applying this test, the D.C. Circuit has held that Bolivia's

Air Force and Iran's Ministry of Foreign Affairs were the foreign states themselves, reasoning that "powers to declare and wage war are among the necessary concomitants of sovereignty" and "foreign affairs is an important and indispensable government function." *Id.* at 743–44. In *De Csepel II*, however, the court concluded that defendant was an agency or instrumentality of Hungary, rather than Hungary itself, because its "management of companies, movable property, and real property" was "overwhelmingly commercial in nature." *Id.* at 745.

Defendant here "manages the foreign exchange reserves of Curaçao and Sint Maarten, including the regulation of transfer of payments between residents . . . and non-residents," Am. Compl. ¶ 13, "is responsible for supervising and licensing 'insurers' in Curaçao and ensuring they remain solvent," *id.* ¶ 33, and has authority to "adopt[] new regulations" governing insurers, *id.* ¶ 45. No private company could perform those functions. In *De Csepel II*, 27 F.4th at 745, by contrast, the D.C. Circuit explained that there was "nothing inherently sovereign about managing energy, gambling, or waste," "maintaining and lending road vehicles, musical instruments, or art pieces," merely because those items belonged to a sovereign. Accordingly, Defendant is better characterized as the foreign state rather than an agency or instrumentality. But even if Defendant were an agency or instrumentality of Curaçao, rather than Curaçao itself, it would not qualify for either expropriation exception.

At the threshold, a plaintiff must show that they have rights in property that were taken in violation of international law under either clause. *See* 28 U.S.C. § 1605(a)(3). The Supreme Court has concluded that "the expropriation exception is best read as referencing the international law of expropriation." *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 180 (2021). Consequently, "the court looks to customary international law" in analyzing whether a

plaintiff "has a property right that was taken." *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F. Supp. 3d 1, 26–27 (D.D.C. 2021) (citing *Philipp*, 592 U.S. at 180).

"International law undisputedly protects the 'direct rights' shareholders enjoy in connection with corporate ownership, including 'the right to any declared dividend, the right to attend and vote at general meetings, and the right to share in the residual assets of the company in liquidation.'" *Helmerich & Payne Int'l Drilling Co. v. Bolvarian Republic of Venezuela*, 743 F. App'x 442, 454 (D.C. Cir. 2018). A foreign state may "take" that property without "formally divest[ing] the shareholder of its shares" when it "permanently takes over management and control of a foreign shareholder's business, completely destroying the beneficial and productive value of the shareholder's ownership of their company, and leaving the shareholder with shares that have been rendered useless." *Id.* For example, in *Helmerich*, the D.C. Circuit found that defendants took over plaintiff's "entire business," depriving plaintiffs of "the entirety of" their "ownership and control of" the entity. *Id.* at 455 (citations omitted).

But "not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation of the shareholder's ownership rights." *Id.* at 454. If "a state's expropriation of a corporation's property . . . does not result in the expropriation of the entire enterprise," the foreign state has not expropriated the shareholder's rights under customary international law, "even if it reduces the value of the shares to zero." *Exxon Mobil Corp.*, 534 F. Supp. 3d at 27 (citation omitted). Applying this framework, a court in this district held that Cuba's expropriation of Exxon Mobil's subsidiary did not "render[] Exxon's shares" in its subsidiary "useless" because there was evidence indicating the subsidiary continued to operate after the expropriation. *Id.* at 28.

Plaintiff alleges that her shares in Parman are "rights in property" that were taken in violation of international law because Defendant's "actions have destroyed all value in them." Am. Compl. ¶ 21. But there are two clear distinctions between the facts in this case and those in cases where courts have indicated that the expropriation exception may apply. First, Plaintiff owns only a 15.9% stake—she is not a majority shareholder. *Id.* ¶ 2. And second, Plaintiff's interest is in Parman—not Ennia, the entity Defendant seized. *See id.* But even assuming Plaintiff has the kind of property interest that Defendant's seizure of Ennia could render "useless" under international law, that did not happen here. *See Schmidt*, 826 F. Supp. 2d at 65 (courts need not accept "legal conclusions that are cast as factual allegations" in the pleadings (citation omitted)). Just like in *Exxon Mobil*, 534 F. Supp. 3d at 28, Ennia continues to operate. In fact, Plaintiff alleges that Defendant has poorly managed Ennia—not that it has "dissolved" it or destroyed its stock value. *See id.* Consequently, Defendant has not "taken" Plaintiff's shares in Ennia in violation of customary international law, and the expropriation exceptions do not apply. And because no exception to the FSIA applies, Defendant "shall be immune from the jurisdiction of the courts of the United States." 28 U.S.C. § 1604.

## IV.   CONCLUSION

For the foregoing reasons, the court will GRANT Defendant's Motion to Dismiss, ECF No. 23. An Order will accompany this Memorandum Opinion.

Date: May 30, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge